**STATE of Maine**

v.

**Richard John GORDON.**

Supreme Judicial Court of Maine.

June 17, 1974.

Henry N. Berry, III, County Atty., Peter G. Ballou, Asst. County Atty., Portland, for plaintiff.

Pierce, Atwood, Scribner, Allen & McKusick by S. Mason Pratt, Jr., Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

An indictment returned (on June 27, 1972) by a Cumberland County Grand Jury to the Superior Court charged defendant, Richard John Gordon, with having committed the crime of "armed robbery" in violation of 17 M.R.S.A. § 3401–A.[1] A separate indictment accused defendant of having, with intention to kill, assaulted a police officer, one Harold Stultz. Defendant was arraigned and pleaded not guilty to each charge. Upon motion by the State, and over defendant's objection, the presiding Justice ordered a single trial on the two indictments. The trial was before a jury. On the "assault" the jury was unable to reach a verdict and as to that charge a mistrial was declared. The jury found defendant guilty of "armed robbery." From the judgment of conviction entered on the verdict defendant has appealed, assigning ten claims of error.

We deny the appeal.

The jury was justified in finding the following facts.

---

1. 17 M.R.S.A. § 3401–A reads:
"Whoever, if armed with a firearm, by force and violence, or by putting in fear, feloniously steals and takes from the person of another property that is the subject of larceny is guilty of robbery and shall be punished by imprisonment for any term of years. The imposition or execution of such sentence shall not be suspended and probation shall not be granted.

One Edwin Strode, and defendant had escaped in Vermont from the custody of the authorities who had been holding them on a misdemeanor charge. In the escape defendant and Strode had acquired two hand guns and also a blue station wagon in which they had fled from Vermont through New Hampshire into Maine. Near Standish, Maine, the station wagon showed signs of engine trouble, and defendant and Strode began to look for another vehicle. They came to the yard of one Franklin Prout. In the yard was Prout's 1966 maroon Chevelle and defendant, who was operating the station wagon, drove it parallel to the Prout Chevelle. Observing that the keys were in the Chevelle, Strode left the station wagon and entered the Chevelle. At this time Prout came out of his house into the yard. Strode pointed a gun at him, and defendant and Strode then told Prout that they needed his automobile, were going to take it but they "would take care of it and see he [Prout] got it back as soon as possible." With defendant operating the station wagon and Strode the Chevelle, defendant and Strode left the yard and proceeded in the direction of Westbrook. Subsequently, the station wagon was abandoned in a sand pit, and defendant and Strode continued their flight in the Chevelle. A spectacular series of events followed—including the alleged assault (with intent to kill) upon Westbrook police officer, Stultz, a shoot-out on Main Street in Westbrook, and a high speed police chase, during which the Chevelle was driven off the road in the vicinity of the Maine Medical Center in Portland where it was abandoned, Strode and defendant having commandeered another automobile to resume their flight. Ultimately, both the defendant and Strode were apprehended, defendant having been arrested on the day following the police chase in the vicinity of the State Police Barracks in Scarborough.

## 1.

As a first point of appeal, defendant maintains that the evidence clearly established that (1) defendant and Strode had told Prout that they "would take care of . . . [the automobile] and see [that] he [Prout] got it back as soon as possible" and (2) defendant intended only a temporary use of Prout's Chevelle. Defendant argues that the evidence thus fails to warrant a conclusion beyond a reasonable doubt that defendant had the specific intent requisite for "robbery." (Hereinafter, reference to the "specific intent" necessary for "robbery" signifies the "specific intent" incorporated into "robbery" as embracing "larceny.")

■ Although defendant is correct that robbery is a crime requiring a particular specific intent, State v. McKeough, Me., 300 A.2d 755 (1973),[2] defendant wrongly apprehends its substantive content.

A summarizing statement appearing in defendant's brief most clearly exposes his misconception of the law. Acknowledging that on all of the evidence the jury could properly

" . . . have inferred . . . that [defendant and Strode] . . . intended to get away from the authorities by going to New York or elsewhere *where they would abandon* the car . . . ", (emphasis supplied)

defendant concludes that, nevertheless, the State had failed to prove the necessary specific intent because it is

2. It is generally required that the necessary specific intent exist simultaneously with the wrongful taking of the property. State v. McKeough, supra, (n. 4, 300 A.2d at p. 757) makes clear that, as noted in State v. Boisvert, Me., 236 A.2d 419 (1967) :
"Maine is one of the jurisdictions which has recognized as an exception to the simultaneous intent rule the principle that if the property is taken from the owner against his will, by a trespass or fraud, a *subsequently* formed intent . . . [of the requisite content] will constitute larceny."
Also: State v. Coombs, 55 Me. 477 (1868).

" . . . entirely irrational to conclude . . . that the defendant himself intended at the time he and Strode took the car, *to keep the car in their possession for any length of time.*" (emphasis supplied)

Here, defendant reveals that he conceives as an essential element of the specific intent requisite for "robbery" that the wrongdoer must intend: (1) an advantageous relationship between himself and the property wrongfully taken, and (2) that such relationship be permanent rather than temporary.

■ Defendant's view is erroneous. The law evaluates the "animus furandi" of "robbery" in terms of the detriment projected to the legally protected interests of the owner rather than the benefits intended to accrue to the wrongdoer from his invasion of the rights of the owner.

As shown by various of the cases compiled in the Annotation 12 A.L.R. 804, et seq., appended to a decision of the Nebraska Court in McIntosh v. State, 105 Neb. 328, 180 N.W. 573, 12 A.L.R. 798 (1920), many of the earlier decisions reveal language disagreements, as well as conflicts as to substance, concerning whether a defendant can be guilty of "robbery" without specifically intending a gain to himself (whether permanent or temporary), so-called "lucri causa." In the more recent cases, there is overwhelming consensus that "lucri causa" is not necessary. See: pertinent cases assembled in the A.L.R. Annotation, supra, and in 50 Am.Jur.2d, Larceny § 39, (pp. 198–201).

In two earlier opinions of this Court language appears suggesting that "lucri causa" is essential to the "animus furandi" of larceny. In State v. Coombs, 55 Me. 477, 480 (1868) it is stated that the wrongful taker of the property must intend to "convert it to [his] . . . use . . . .." In State v. Morin, 131 Me. 349,

352, 163 A. 102, 103 (1932) the phrasing is that the wrongdoer must intend

"to deprive the owner of his property *and appropriate the same* . . . .." (emphasis supplied)

The language, "convert it to the taker's use", in State v. Coombs, supra, is part of a quotation from Baron Parke in Regina v. Holloway, 2 Car. & Kir. 942, 944 (1848). Had *Coombs* fully quoted Baron Parke, it would have shown that he was speaking of a then prevalent definition advanced by one, "Mr. East" which Baron Parke thought misleading and in need of clarification. Baron Parke explained that the "East" definition would be correct only if taken to mean that the "animus furandi" in larceny is

" 'intent' . . . to deprive the owner, not temporarily, but permanently, of his property." (p. 946)

Further, in Regina v. Holloway, supra, Baron Parke asserted that the case of Rex v. *Webb* and *Moyle*, 1 M.C.C. 431 (1935) was authority that the specific intent requisite for larceny is constituted solely by the intent to deprive the owner permanently of his property and, hence, "lucri causa" is not an essential element of it. (p. 845).[3] Finally, all of the other judges in Regina v. Holloway (who gave expression to their views)—Alderson, B., Lord Denman, C. J., and Coltman, J.,—agreed with Baron Parke that the specific intent requisite for larceny is only the intent to deprive permanently the owner of his property. (pp. 945–947)

The same point clarifies this Court's use in State v. Morin, supra, of the concept of "appropriation" in conjunction with the language "to deprive the owner of his property." The opinion refers to one authority: 2 Bishop's New Crim. Law, § 379. The author of that treatise, like Baron Parke in Regina v. Holloway, supra, carefully explains that words such as "appro-

---

3. Baron Parke could have mentioned to the same effect the 1815 case of Rex v. Cabbage, Rus. & Ry. 292.

priate" or "convert . . . to the taker's use" are not intended to convey that "lucri causa" is essential but only to emphasize that the defendant must intend conduct producing a permanent, rather than temporary, effect upon the owner's interest to have continuing enjoyment of his property. 2 Bishop's Criminal Law (9th ed., 1923) §§ 840 and 841 (at pp. 638 and 640). Citing English cases:—Regina v. Jones, 1 Den.C.C. 188, 2 Car. & Kir. 236; Regina v. Privett, 1 Den.C.C. 193, 2 Car. & Kir. 114; Rex v. Morfit, Rus. & Ry. 307 and Rex v. Cabbage, Rus. & Ry. 292, the "Bishop" text asserts:

> "The English courts seem at last to have utterly overthrown the old notion of *lucri causa*." (Section 846 at p. 645)

*Bishop* then states the ultimate conclusion that "on principle" it is erroneous to require *lucri causa* since this

> "is to place the love of greed, as a base motive, pre-eminent over all other base motives. . . . [In any event] it is immaterial to the person injured what species of base motive moved the wrongdoer. And the wrong to society is the same whatever the nature of the baseness." (Section 848 at p. 647)

■ We now decide, in confirmatory clarification of the law of Maine, that "lucri causa" is not an essential element of the "animus furandi" of "robbery." As stated most recently in State v. McKeough, supra, the specific intent requisite for "robbery" is defined solely in terms of the injury projected to the interests of the property owner:—specific intent "to deprive permanently the owner of his property." (300 A.2d p. 757) Also: State v. Greenlaw, 159 Me. 141, 189 A.2d 370 (1963); Stanley v. Prince, 118 Me. 360, 108 A. 328 (1919); Wheeler v. Phoenix Assurance Company, Ltd., 144 Me. 105, 65 A.2d 10 (1949).

■ The instant question thus becomes: on the hypothesis, arguendo, that defendant here actually intended to use the Prout automobile "only temporarily" (as he would need it to achieve a successful flight from the authorities), is defendant correct in his fundamental contention that this, *in itself*, negates, *as a matter of law,* specific intent of defendant to deprive permanently the owner of his property? We answer that defendant's claim is erroneous.

Concretely illustrative of the point that a wrongdoer may intend to use wrongfully taken property "only temporarily" and yet, without contradiction, intend that the owner be deprived of his property permanently is the case of a defendant who proposes to use the property only for a short time and then to destroy it. At the opposite pole, and excluding (as a matter of law) specific intent to deprive permanently the owner of his property, is the case of a defendant who intends to make a temporary use of the property and then by his own act to return the property to its owner. Between these two extremes can lie various situations in which the legal characterization of the wrongdoer's intention, as assessed by the criterion of whether it is a specific intent to deprive permanently the owner of his property, will be more or less clear and raise legal problems of varying difficulty.

In these intermediate situations a general guiding principle may be developed through recognition that a "taking" of property is *by definition* "temporary" only if the possession, or control, effected by the taking is relinquished. Hence, measured by the correct criterion of the impact upon the interests of the owner, the wrongdoer's "animus furandi" is fully explored for its true legal significance only if the investigation of the wrongdoer's state of mind extends beyond his anticipated *retention* of possession and includes an inquiry into his contemplated manner of *relinquishing* possession, or control, of the property wrongfully taken.

On this approach, it has been held that when a defendant takes the tools of another person with intent to use them tempo-

rarily and then to leave them wherever it may be that he finishes with his work, the fact-finder is justified in the conclusion that defendant had specific intent to deprive the owner permanently of his property. State v. Davis, 38 N.J.L. 176 (1875).

Similarly, it has been decided that a defendant who wrongfully takes the property of another intending to use it for a short time and then to relinquish possession, or control, in a manner leaving to chance whether the owner recovers his property is correctly held specifically to intend that the owner be deprived permanently of his property. State v. Smith, 268 N.C. 167, 150 S.E.2d 194 (1966).

The rationale underlying these decisions is that to negate, as a matter of law, the existence of specific intent to deprive permanently the owner of his property, a wrongful taker of the property of another must have in mind not only that his retention of possession, or control, will be "temporary" but also that when he will relinquish the possession, or control, he will do it in some manner (whatever, particularly, it will be) he regards as having affirmative tendency toward getting the property returned to its owner.[4] In the absence of such thinking by the defendant, his state of mind is fairly characterized as *indifference* should the owner *never* recover his property; and such indifference by a wrongdoer who is the moving force separating an owner from his property is appropriately regarded as his "willingness" that the owner *never* regain his property. In this sense, the wrongdoer may appropriately be held to entertain specific intent that the deprivation to the owner be permanent.

In Commonwealth v. Salerno, Mass., 255 N.E.2d 318 (1970) the Massachusetts Court adopted this principle, holding that:

"One who takes property without the authority of the owner and . . . [with] indifference whether the owner recovers possession may be found to intend to deprive the owner of it permanently." (p. 321)

We agree.

■ On this basis, the evidence in the present case clearly presented a jury question as to defendant's specific intent. Although defendant may have stated to the owner, Prout, that defendant

"would take care of . . . [the automobile] and see [that] . . . [Prout] got it back as soon as possible",

defendant himself testified that

"[i]n my mind it was just to get out of the area. . . . Just get out of the area and leave the car and get under cover somewhere."

This idea to "leave the car" and "get under cover somewhere" existed in defendant's mind as part of an uncertainty about where it would happen. Because defendant was ". . . sort of desperate during the whole day", he had not "really formulated any plans about destination."

Such testimony of defendant, together with other evidence that defendant had already utterly abandoned another vehicle (the station wagon) in desperation, plainly warranted a jury conclusion that defendant's facilely uttered statements to Prout were empty words, and it was defendant's

---

4. Since we are here dealing with specific intent of the wrongdoer, the legal criterion is in subjective terms: whether or not defendant actually has in his mind the thought of relinquishing possession, or control, of the wrongfully taken property in a manner which will, *as defendant thinks of it*, be an affirmative step toward a recovery of the property by its owner. Whether the manner in which de-fendant *in fact* relinquishes his possession, or control, has, or has not, a reasonable tendency in all the circumstances (objectively) to assist in a recovery of the property by the owner may be *evidence* of defendant's actual state of mind. Evidence, however, must be distinguished from the ultimate fact legally required to be proved by evidence.

true state of mind to use Prout's Chevelle and abandon it in whatever manner might happen to meet the circumstantial exigencies of defendant's predicament—without defendant's having any thought that the relinquishment of the possession was to be in a manner having some affirmative tendency to help in the owner's recovery of his property. On this finding the jury was warranted in a conclusion that defendant was indifferent should the owner, Prout, *never* have back his automobile and, therefore, had specific intent that the owner be deprived permanently of his property.

In arriving at this decision, we have in mind this Court's approach to the instruction requested in State v. Greenlaw, supra:

"If you find that Respondents intended to take the cab but to take it only temporarily, then your verdict as to robbery and also larceny must be not guilty." (159 Me. p. 147, 189 A.2d p. 373)

One point made in *Greenlaw* was that although the presiding Justice had instructed the jury that defendant's specific intent must be to deprive the owner of his property, he had entirely omitted to mention the further legal requirement that such deprivation must be intended as *permanent* (and not merely temporary). Hence, the requested instruction would have been beneficial because, in the language of *Greenlaw*, it

"would have afforded an elucidation which under the circumstances must be deemed to have been necessitous and properly would have supplied definitive enlightenment unpossessed by the jury." (159 Me. p. 149, 189 A.2d p. 374)

In this aspect, the Court's approach in *Greenlaw* was clearly correct.

In a further critical respect, however, (see ante) the requested instruction was incomplete and, therefore, an erroneous statement of the law of "animus furandi." Confining itself to the ultimate conclusory statement:

"[i]f . . . Respondents intended to take the cab . . . only temporarily",

the requested instruction mandated that the jury return a "not guilty" verdict without further requiring the jury to determine whether respondents had in mind a relinquishment of possession, or control, in a manner thought by them to have some tendency affirmatively to assist in a return of the cab to its owner. As our prior discussion clarifies, notwithstanding that the respondents in *Greenlaw* may have intended to retain possession of the cab "only temporarily", if they did not have in mind the thought of relinquishing possession, or control, of the cab in some manner they deemed affirmatively helpful toward effectuation of a return of the cab to its owner, the jury would have been justified in concluding that respondents had been *indifferent* should the owner *never* recover his cab and thus had specific intent that the owner be deprived permanently of it. The presiding Justice in *Greenlaw*, therefore, correctly declined to give the instruction therein requested. To the extent that by sustaining the exception to the refusal of the presiding Justice to charge the jury as had been requested, State v. Greenlaw decided to the contrary, it is overruled.[5]

## 2.

The foregoing analysis reveals lack of merit in a second point here raised by defendant—that there was error in the

---

5. It may be true that frequently when defendants have declared that they have only "borrowed" an automobile or otherwise used it "temporarily", prosecutors may decide to charge only a violation of 17 M.R.S.A. § 2498 (taking the automobile without the consent of the owner) or 29 M.R.S.A. § 900 (using an automobile without authority from the owner). That prosecutors may thus choose

to exercise their prosecutorial discretion does not mean that a prosecution for "larceny" would fail if the prosecutor could prove that, notwithstanding defendant intended to use the wrongfully taken property "only temporarily", his state of mind was one of indifference should the owner never have his property returned.

charge of the presiding Justice concerning the specific intent requisite for robbery.

Defendant first refers to portions of the charge in which the presiding Justice described respects in which the proof of requisite specific intent would be legally deficient. These extracts are:

(a) "If you find that the defendant . . . intended to take the car temporarily *with the idea . . . [to abandon] it where it would be returned to Mr. Prout, . . . or to make arrangements to return it to Mr. Prout* . . . he cannot be guilty of robbery";

(b) " . . . was that intent in their mind *to bring that car back to Mr. Prout.* . . . If you find they did . . . then he is not guilty of robbery";

(c) ". . . if you find . . . that he intended *to return it to him, see that it was returned,* you find him not guilty." (all above emphases supplied)

Defendant then adverts to another portion of the charge in which the presiding Justice authorized the jury to conclude that the State had sufficiently proved the necessary specific intent:

". . . if you find that when he . . . took that car, . . . [he] *was not going to return it, had no idea of getting it returned . . .*." (emphasis supplied)

Defendant concedes that because he had made no objection at the trial level to the instructions of which he now complains, error in them, if any, is cognizable in this appeal only within the "manifest error-serious injustice" doctrine. State v. Langley, Me., 242 A.2d 688 (1968); State v. Collins, Me., 297 A.2d 620 (1972); State v. McKeough, Me., 300 A.2d 755 (1973); State v. Pratt, Me., 309 A.2d 864 (1973), and State v. Northup, Me., 318 A.2d 489 (1974). Thus predicated, defendant's claim is patently deficient.

■ In the foregoing portions of his charge to the jury the presiding Justice acted correctly in seeking to explain to the jury that notwithstanding that defendant may have intended only a temporary use of the Chevelle, if he did not have in his mind a contemplated relinquishment of possession, or control, in some manner deemed by him to have tendency affirmatively to assist in the vehicle's being returned to the owner, the jury was entitled to find that defendant specifically intended that the owner be deprived permanently of his property. The presiding Justice was striving to clarify this point for the jury by using colloquial phrases such as: "see that it was returned", "abandoning it where it would be returned", "idea of getting it returned", "idea . . . to make arrangements to return it" and "intended to . . . see that it was returned."

Defendant's position is that such phraseology suggested to the jury that defendant's contemplated relinquishment of possession, or control, must tend to aid in the owner's recovery of his property with a degree of specificity and positiveness much higher than the law demands. The claim is that the instruction would cause the jury to believe erroneously:

"Unless [defendant] Gordon intended to return the car himself or to arrange for its return by taking positive action (such as hiring someone to return it or by reporting it to the authorities) there would exist the requisite intent . . . [for robbery]."

It is doubtful that defendant's characterization is correct. In any event, even if the error asserted by defendant be assumed, it is at best technical and, on the totality of the evidence, insufficient to have deprived defendant of a fair trial.

Defendant takes nothing from his attack on the charge of the presiding Justice.

### 3.

Denying a motion of defendant for separate trials and granting the State's motion that a single trial be held on both indictments, the presiding Justice ordered the two indictments against defendant to be tried together. Having objected to the rulings, defendant now claims on appeal that the presiding Justice committed reversible error.

Rule 13 M.R.Crim.P., authorizes

" . . . two or more indictments . . . to be tried together if the offenses, . . . could have been joined in a single indictment . . .."

Separate offenses may be joined in a single indictment (charged in separate counts) if the offenses

" . . . are based on . . . two or more acts or transactions which are connected *or* which constitute parts of a common scheme or plan." Rule 8(a) M.R.Crim.P. (emphasis supplied)

■ The use of the disjunctive in Rule 8(a) reveals that notwithstanding that the acts underlying two offenses may fail as "parts of a common scheme or plan", if they are in any manner "connected", the separate offenses may be joined in one indictment and, if charged in separate indictments, heard in a single trial.

The question here, then, is whether some reasonable connection may be discerned between the acts on which the charge of "armed robbery" rests and the conduct underlying the accusation that defendant, with intent to kill, assaulted Officer Stultz. If there is such reasonable connection, the presiding Justice had a broad discretion to order one trial on the two indictments, and his ruling will not be reversed on appeal except for abuse of discretion. Swett v. State, Me., 268 A.2d 814 (1970).

■ We conclude that the presiding Justice acted within the proper limits of the discretion reposed in him.

There was a reasonable connection between the conduct of the defendant, as alleged to constitute "armed robbery", and his conduct as charged to be an "assault with intent to kill." Essential to the proof of the armed robbery charge was a showing that defendant had specific intent that the owner of the automobile (wrongfully taken) be deprived permanently of it. On this point, all facets of defendant's use of the automobile and manner of relinquishing possession of it, and, in particular, defendant's acts to escape apprehension by police officers, would have material bearing upon whether, despite his utterances that he would use the Prout automobile only temporarily and see that the owner would get it back, defendant's true state of mind was being directed only to a prospective relinquishment of possession of the automobile in whatever manner would be necessary to save himself from being caught rather than to the taking of precautions affirmatively tending to assist toward the owner's recovery of the automobile.

Moreover, almost all of the prior events, including defendant's participation in the armed robbery of Prout, would be highly material events concerning the accusation that defendant, with intent to kill, had assaulted Officer Stultz. The prior incidents would tend to establish that defendant was prepared to go to any extremes to effectuate his escape including shooting to kill, as might be necessary, any police officer seeking, or in a position, to apprehend him.

■ There thus existed a bilateral evidentiary interconnection between the conduct of defendant as involved in the "armed robbery" charge and defendant's acts as alleged to be an assault upon Officer Stultz with intent to kill him. In ordering a single trial on the two indictments charging these offenses against defendant, the presiding Justice avoided undue repetition of evidence and the general duplication of energy and expense involved in the conduct of two separate trials. There was no indication of potential prejudice to the defendant sufficient to offset these benefits.

The similarity between the two offenses charged against defendant made it unlikely that the jury would become confused in dealing with the underlying issues. That the jury would be informed that defendant was involved in two crimes is inherent in any situation in which there is a joinder of offenses for trial and, in the absence of any other unusual circumstances, will not by itself be sufficient to mandate separate trials. See: Daly v. United States, 119 U.S.App.D.C. 353, 342 F.2d 932 (1965). Here, no exceptional circumstances indicative of unusual detriment to defendant appear.

The presiding Justice acted within the proper bounds of discretion in ordering a single trial of the two indictments against defendant. Defendant's contention to the contrary must be rejected.

### 4.

In his opening statement, having summarized information he expected to elicit as testimony from various persons who would be witnesses for the State, the prosecutor said:

> "We also intend to call another witness, the man who was at Standish with the gun, a man named Edwin Strode, and he, of course, knew who was with him at the time, he, in the meantime, having been convicted of robbery himself."

The prosecutor never called Edwin Strode as a witness for the State. In a conference held in the absence of the jury he gave as his reason:

> ". . . I had intended to call . . . Edwin D. Strode. He is now serving a sentence in the Maine State Prison and has been brought down and is now in Cumberland County Jail and could be brought over.
>
> "However, I have talked with Mr. Strode. He is not willing to testify, has indicated that he will assert his right to whatever constitutional protection he may have, and in light of this . . .

in light of the fact that he's obviously uncooperative, I do not intend to call him."

Defendant did not move for a mistrial during, or at the conclusion of, the opening statement of the prosecutor. Neither did defendant request a mistrial when the State rested without having called Strode as a witness. Only now, for the first time at the appellate level, does defendant see fit to complain of the prosecutor's opening statement remarks about Strode. Defendant claims that (1) in themselves and (2) as coupled with the State's failure to produce Strode as a witness, the comments concerning Strode deprived defendant of a fair trial thus to require appellate reversal of the judgment of conviction.

We consider, first, defendant's position as predicated on the combination of the opening remarks and the State's failure to call Strode as a witness. In this aspect, defendant's claim is directed to an asserted violation of a specific right guaranteed by the "Bill of Rights", the "right of confrontation" as protected against State invasion by the Sixth-Fourteenth Amendments to the Constitution of the United States. The argument is that the remarks in the opening statement had the effect of informing the jury that Strode had already confessed to committing the robbery and the prosecutor's failure, thereafter, to call Strode as a State's witness caused a violation of defendant's constitutional right of confrontation because it became highly likely that the jurors would treat the prosecutor's message as evidence although it was in a form not subject to cross-examination.

■ The contention must be rejected under the controlling authority of Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L. Ed.2d 684 (1969). Here, as in Frazier v. Cupp: (1) the summary of the evidence expected to be produced through Strode, as a purported accomplice of the defendant, was extremely brief; (2) no undue emphasis had been placed upon it as a critical part of the prosecutor's case; (3) the

prosecutor had not stated expressly that Strode, as the alleged accomplice, had made an extra-judicial confession;[6] and (4) the jury was instructed by the presiding Justice that any statements of counsel are not evidence.[7]

In Frazier v. Cupp defendant had carefully preserved for appellate review his claim of error as predicated on a violation of the right of confrontation. He had made appropriate motions for mistrial both at the conclusion of the opening statement of the prosecutor and during the presentation of evidence when there was a failure of the alleged accomplice to testify, subject to cross-examination, to the information summarized by the prosecutor in his opening statement. Yet, the Supreme Court of the United States concluded that there was no violation of defendant's constitutionally guaranteed right of confrontation. Since in the posture of the instant appeal defendant must show not only a violation of his right of confrontation but also that if such error occurred, its effect, on the totality of the record before us, denied defendant a fair trial, the decision in Frazier v. Cupp is controlling here, a fortiori.

A separate claim by defendant is that the prosecutor's opening statement reference to Strode's having been convicted of the robbery for which defendant was on trial was, ipso facto, prosecutorial misconduct sufficiently prejudicial in its effects to have deprived defendant of a fair trial.

■ Defendant is correct in his assertion that the remarks of the prosecutor were improper conduct by him. Quig v. United States, 33 F.2d 820 (3rd Cir. 1929); State v. Peters, 82 R.I. 292, 107 A.2d 428, 48 A.L.R.2d 999 (1954); Knowles v. State, 44 Ala.App. 163, 204 So.2d 506 (1967).[8]

We conclude, however, that the entirety of the record before us reveals that the prosecutor's improper statement did not render defendant the victim of a fundamentally unfair trial.

Judicial pronouncements as to whether, and how, a potential for prejudice to a de-

6. Defendant's argument in this facet is that the prosecutor's mention that Strode had already been convicted of robbery allowed the jury to infer that Strode's conviction was the result of a guilty plea. We need not consider whether this is a valid premise for defendant's argument since, in any event, the indirectness of the prosecutor's approach here, as well as the need for a jury inference as to the existence of an extra-judicial confession, are similar to the indirectness of approach and need for jury inference in Frazier v. Cupp (in which by referring to a paper which he was holding to refresh his memory about something the purported accomplice of Frazier had said, the prosecutor allowed the jury to infer that the purported accomplice had made an extra-judicial confession.)

7. In the instant case, the instruction of the presiding Justice came in his charge to the jury and was as follows: ". . . statements made by counsel, both counsel for the State· and counsel for the defendant, that's not evidence. . . ., what they say to you is not evidence. The evidence is, as you remember, from the witness stand . . . ., the exhibits you received. That is what evidence is."

Should it be thought that a more direct limiting construction would have been more effective, here, as in Frazier v. Cupp, the result remains unaffected because no request for a more directly limiting instruction had been made. (See footnote at p. 735 of 394 U.S., p. 1420 of 89 S.Ct.). Moreover, we should not ignore that a limiting construction referring explicitly to that portion of the prosecutor's opening statement in which Strode was discussed could have been counter-productive since it would refresh the jury's recollection specifically and immediately before they would enter upon their deliberations to arrive at a verdict.

8. We note also that Frazier v. Cupp, supra, intimates strongly that if a prosecutor who is describing to the jury the substance of testimony which he expects to elicit from a purported accomplice whom he will call as a prosecution witness mentions the existence of an extra-judicial confession of the accomplice, the prosecutor may be acting in violation of defendant's constitutional right of confrontation. For this reason, a prosecutor is well advised to confine himself to a summary of the testimony which the purported accomplice is expected to give on the witness stand and to avoid any reference to the existence of an extra-judicial confession by the alleged accomplice or any mention that the anticipated testimony is already contained, in substance, in such a confession.

fendant may be purged from a jury's exposure to extraneous matters inadmissible as evidence reflect the polar extremes of: (1) the concurring statement of Mr. Justice Jackson in Krulewitch v. United States, 336 U.S. 440, 445, 453, 69 S.Ct. 716, 723, 93 L.Ed. 90 (1949):

"The naive assumption that prejudicial effects can be overcome by instructions to the jury, . . . all practicing lawyers know to be unmitigated fiction."

and (2) the comment of Mr. Justice Frankfurter in his dissent in Stewart v. United States, 366 U.S. 1, 11, 21, 81 S.Ct. 941, 954, 6 L.Ed.2d 84 (1961):

"One does not have to accept all the encomia which opinions . . . have showered on the jury's functions and values, not to attribute fecklessness to the twelve men and women chosen to sit in this . . . case. To make such attribution is to be unconsciously betrayed, as sophisticates sometimes are, into a depreciation of the capacities of the run of men."

That individual cases can engender judicial utterances of such divergence underscores that as to the subject-matter now under consideration each case stands essentially on its own facts—with a measure of guidance capable of being derived, however, from the approaches taken in other decided cases having pattern resemblances to the case awaiting decision.

As to the instant case, we find that two of the more recent decisions of the Supreme Court of the United States provide such "pattern" assistance to us.

In Donnelly v. DeChristoforo, —— U.S. ——, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) the Supreme Court of the United States made two important points concerning prosecutorial misconduct occurring in the form of improper remarks made by a prosecutor as an incidental part of a more comprehensive summarizing statement by him to the jury. First,

". . . a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (p. ——, 94 S.Ct. p. 1873)

Second, although this kind of prosecutorial misconduct is not to be condoned or generally tolerated, in any given context in which it is being evaluated in terms of whether there has been fundamental unfairness to a defendant it must be clearly differentiated from

"that sort of egregious misconduct held in Miller [v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) which, in turn, relied on Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)] and Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] . . . to amount to a denial of constitutional due process." (p. ——, 94 S.Ct. p. 1873)

In Frazier v. Cupp, supra, the Supreme Court of the United States made clear that if a prosecutor's opening statement mentions extraneous matters evidentially inadmissible and potentially prejudicial to the defendant briefly and in a manner

"not touted to the jury as a crucial part of the prosecution's case" (p. 736 of 394 U.S., p. 1423 of 89 S.Ct.),

a curative instruction in the charge of the presiding Justice, even if only generally to the effect that statements of the prosecutor are not evidence, can effectively salvage the fundamental fairness of the trial since

"it does not seem at all remarkable to assume that the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial." (p. 736 of 394 U.S., p. 1423 of 89 S.Ct.)

With Donnelly v. DeChristoforo and Frazier v. Cupp thus affording guidance,

we decide that the totality of the record now before us reveals that, here, the prosecutor's opening statement reference to Strode's having been convicted of the robbery for which defendant was being tried did not cause defendant's trial to be fundamentally unfair. The prosecutor's remark was momentary and did not highlight Strode's conduct or his testimony as a critical feature of the prosecutor's case. Further, we disagree with defendant's contention that on the evidence the issue of "animus furandi", as an essential element of the crime, was extremely close such that even a trivial carry-over of prejudice from the opening statement of the prosecutor would tip the scales against defendant. On the correct application of the proper governing principles of law, as carefully explained ante, the evidence as to "animus furandi" was strongly against the defendant. In his own testimony defendant told the jury that when he took the Prout automobile he was, as he had been the whole day, ". . . sort of desperate", and it was in his mind "just to get out of there . . . and leave the car and get under cover somewhere", defendant having already abandoned one automobile to meet the exigencies of his own predicament. On this evidence it is far-fetched, indeed, for defendant to argue that the question of "animus furandi" hung "by the slenderest of threads."

To buttress his position defendant maintains that the improper conduct of the prosecutor was not an innocent mistake but was done in bad faith because the prosecutor made his opening statement knowing that Strode would claim his privilege against self-incrimination and refuse to give testimony.

■ Apart from the question of whether prosecutorial misconduct otherwise insufficient to require reversal of a judg-

ment of conviction can ever become transformed into a ground of reversible error solely because the prosecutor acted in bad faith,[9] the record is inadequate to authorize a conclusion by this Court that there was prosecutorial bad faith.

The record shows that before trial opened defendant's attorney made an oral motion seeking an anticipatory ruling by the presiding Justice to prohibit the State from calling Strode as a prosecution witness. In support of his motion defendant's attorney said:

" . . . the State knows that he [Strode] will take the Fifth Amendment privilege against self-incrimination. The reason the State knows this is that the State is prepared to offer immunity at the time he does take the Fifth Amendment."

As soon as defendant's attorney had concluded his statement, the presiding Justice took over and observed:

"Well, I think that is a matter for when they offer Dr. Strode as a witness. At that time I will see that—assuming that he is going to take the Fifth Amendment, if he does, I will see to it that the jury is removed and then we'll question Mr. Strode as to whether or not he knows his rights, and so forth. I don't think I can rule on it at this time. I think he has to be placed on the stand, and see what he does. We don't know. He may offer to testify without immunity. I don't know, but that will have to be taken up, but I'll see to it that the jury will not—it will not be in the presence of the jury."

The matter was thus left in the posture that the prosecutor had said nothing, and had not been asked to comment, concerning whether the statements made by defendant's attorney were in fact true or false, either in whole or in part. When, there-

9. In Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) the Supreme Court of the United States emphasized that "The principle of Mooney v. Holohan [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." (373 U.S. p. 87, 83 S.Ct. p. 1197.)

after, the prosecutor rested the State's case and gave his explanation as to why he had decided against calling Strode as a prosecution witness, the prosecutor did not indicate whether he had learned of Strode's uncooperativeness before or after he had made his opening statement to the jury. It is clear, however, that during the course of his explanation, the prosecutor told defendant's attorney that Strode was readily available to be interviewed by him at the Cumberland County Jail and defendant's attorney stated explicitly that "he would like to talk to him" before the defendant would open his own case to the jury on the following day.

Defendant's attorney thereafter never represented to the Court whether he had interviewed Strode or whether he had ascertained from Strode the time when the prosecutor had learned that Strode was intending to refuse to testify on grounds of self-incrimination. Moreover, relative to the prosecutor's opening statement to the jury, defendant's attorney never made a motion for a mistrial at any time after the prosecutor had stated his reasons for declining to call Strode as a State's witness.

The record is, therefore, plainly inadequate to authorize an appellate tribunal, absent any finding on the issue by the trial Court, to make a finding of fact that when the prosecutor made his opening statement remarks concerning Strode, the prosecutor lacked good faith expectation that Strode would testify.

■ In the "manifest error-serious injustice" posture in which alone we may here take appellate cognizance of the issue of the prosecutor's opening statement re-

marks about Strode we must conclude, without in any manner suggesting that we approve or condone the prosecutorial misconduct, that in the instant circumstances the wrongdoing by the prosecutor did not deprive defendant of a fundamentally fair trial.

### 5.

Less extended discussion is required to show that the six other points of appeal raised by defendant lack merit.

■ Defendant has complained that the presiding Justice erred in refusing to grant the defendant twenty peremptory challenges in the selection of the jury. Defendant acknowledges that since the crime of armed robbery here charged against him is punishable by a sentence of imprisonment for "any term of years" rather than for "life", the textual language of Rule 24(c)(3) M.R.Crim.P.,[10] supports the ruling of the presiding Justice. The ultimate thrust of defendant's argument is that we should ignore the distinction explicitly delineated in Rule 24(c)(3) and also overrule the holding of Geneau v. State, 161 Me. 467, 214 A.2d 103 (1965) that in the law of Maine "imprisonment for life" is differentiated significantly, both in meaning and various concomitant and consequential features, from "imprisonment for any term of years." See also: State v. Howard, 117 Me. 69, 72, 102 A. 743, 745 (1918); State v. Dyer, 136 Me. 282, 283, 8 A.2d 301 (1939); cf. Wade v. Warden, 145 Me. 120, 125, 130, 73 A.2d 128 (1950). We reject such suggestion of defendant and hold that the presiding Justice correctly denied defendant entitlement to twenty peremptory challenges.[11]

---

10. Rule 24(c)(3) M.R.Crim.P., provides:
"If the offense charged is punishable by life imprisonment, the State is entitled to 10 peremptory challenges and the defendant or defendants jointly to 20 peremptory challenges. In all other felony prosecutions each side shall be entitled to 8 peremptory challenges. In all other criminal prosecutions each side shall be entitled to 4 peremptory challenges."

11. In his reply brief defendant has indicated that to condition the number of peremptory challenges. on a differentiation between offenses punishable by imprisonment for "life" and those punishable by imprisonment for "any term of years" may raise a constitutional question of invidious discrimination in violation of the equal protection of the laws. We do not consider such constitutional issue since defendant has not properly precipitated, or preserved, it for appellate cognizance in this proceeding.

■ Defendant attacks the indictment as defective because it failed to allege (in addition to its averment that defendant acted "by force and violence") that the victim, Prout, was "put in fear." The issue has been settled against defendant's claim by our decisions in State v. Levesque, Me., 281 A.2d 570 (1971) and Morgan v. State, Me., 287 A.2d 592 (1972).

■ Defendant further maintains, however, that even if the failure of the indictment to allege that Prout was "put in fear" by defendant's conduct did not invalidate the indictment, it nevertheless rendered erroneous an instruction to the jury by the presiding Justice which authorized the jury to rely upon Prout's having been put in fear as an alternative upon which to find defendant guilty of robbery. Defendant had made no objection to the admission of the evidence that Prout had in fact been put in fear or to the charge of the presiding Justice referring to the "putting in fear" alternative basis on which a guilty verdict of robbery might be returned against defendant. In this aspect, then, the judgment of conviction is subject to reversal, as defendant concedes, only within the "manifest error-serious injustice" doctrine. In such context all that need be said is that since defendant's participation in the pointing of a firearm at Prout while defendant and Strode were taking Prout's automobile was unquestionably the use of "force and violence", the error in the charge of the presiding Justice, if any, far from being so prejudicial as to deny defendant a fair trial, was plainly harmless.

■ Defendant claims reversible error in the rulings of the presiding Justice, repeatedly objected to by defense counsel, which admitted into evidence the testimony of four witnesses describing the police high-speed pursuit of the defendant and Strode through the cities of Westbrook and Portland. This evidence was material to issues concerned with essential elements of the crimes for which defendant was on trial:—the "animus furandi" necessary for robbery and defendant's "specific intent to kill" as requisite in the charge of assault with intent to kill. The evidence was an important part of the State's proof that during the entire time defendant was fleeing from the police in the State of Maine, and including the time of his encounter with Prout as well as continuously thereafter, defendant's desperation desire to escape apprehension was so intense that (1) as bearing upon the "animus furandi" of robbery, defendant was never truly thinking (despite the words he uttered) about relinquishing possession of the Prout automobile in some manner which he believed would tend, affirmatively, to assist in Prout's recovery of his automobile and (2) as to defendant's specific intent to kill police Officer Stultz, defendant would not hesitate to shoot to kill at any time he found himself in danger of being apprehended by a police officer. The ruling of the presiding Justice was thus clearly within his proper discretion to admit evidence which had significant probative value on important issues of the case notwithstanding that it might also inject extraneous features potentially prejudicial to defendant. State v. Northup, Me., 318 A.2d 489 (1974).

■ Of one witness who testified concerning the high-speed chase the prosecutor asked questions which brought to the jury's attention that the witness happened to see the chase in process because she was enroute to the hospital to give birth to a baby. The questions had been asked and the answers given before defense counsel objected. When objection was ultimately forthcoming from defense counsel, the presiding Justice sustained the objection, and commented to the prosecutor: "I don't think that is necessary." Defendant's claim on appeal is that the prosecutor had so effectively aroused the emotions of the jurors against defendant, by showing the dangers defendant had caused to an expectant mother, that they could not afford defendant a fair trial. The short answer to this contention is that, despite the im-

propriety of the prosecutor's tactics of which we strongly disapprove, in light of the totality of the evidence against defendant we simply disagree that this incident was sufficient to have rendered defendant's trial fundamentally unfair.

During the voir dire examination of the prospective jurors and while all of them were being questioned by the attorney for the defendant to ascertain the extent of their familiarity with the case as the result of newspaper, radio and television pre-trial publicity, one of the prospective jurors asked:

"Is that the one where two men escaped from Vermont and stole a car . . . ?"

He was immediately interrupted by the presiding Justice who announced:

"I'm not criticizing you. I just don't want to let it get to the other jurors to hear the facts that are perhaps not admissible."

It is defendant's claim on appeal that this incident was sufficiently prejudicial to the defendant to have precluded him from having a fundamentally fair trial. By the same reasoning adduced in support of our conclusion as to the remarks made by the prosecutor to the jury which had actually been impanelled to hear the case—and which were improper because they might induce the jury to infer defendant's guilt from Strode's having been convicted of the robbery charged against defendant (ante at pp. 363–365)—we decide that the incident now under consideration, and which occurred before a jury had been impanelled, lacked such high potential for ineradicable prejudicial impact upon those who ulti-mately became jurors as to deny to defendant a fundamentally fair trial.

Defendant's last claim on appeal is that the presiding Justice was guilty of an abuse of discretion in denying defendant's motion for a change of venue because of an allegedly prejudicial climate created by pre-trial publicity.

Without discussing in detail the nature of the pre-trial publicity here involved, we need say only that it generally conformed to reasonable standards of fair reporting, and lacked the

". . . continuous and persistent vehemence and intensity which tends to infect a whole community." State v. Coty, 229 A.2d 205, 212 (1967)

Moreover, as shown by the voir dire examination of the prospective jurors, only one of whom recalled the pre-trial publicity, the pre-trial publicity had in fact failed to produce

"a bias or prejudice against the defendant or a fixed and settled impression as to his guilt or innocence." State v. Pritchett, Me., 302 A.2d 101, 104 (1973)

Within the principles extensively analyzed and formulated by this Court in State v. Coty, supra, and as more recently reaffirmed and applied in State v. Collins, Me., 297 A.2d 620 (1972) and State v. Pritchett, supra, we conclude that the presiding Justice acted without error in denying defendant's motion for a change of venue.

The entry is:

Appeal denied.

All Justices concurring.

WEBBER, J., sat at argument but retired before the decision was rendered.