**STATE of Maine**

**v.**

**Edward R. BOUTOT.**

Supreme Judicial Court of Maine.

Sept. 5, 1974.

Vernon I. Arey, Malcolm L. Lyons, Asst. Attys. Gen., Augusta, for plaintiff.

Fitzgerald, Donovan & Conley, P.A. by Duane D. Fitzgerald, J. Michael Conley, III, Bath, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WEATHERBEE, Justice.

At about 10:30 on the night of September 13, 1971, Mrs. Morehead had just returned to her residence in Freeport with two male guests when the Defendant, a jealous suitor, made a sudden and unwelcome appearance in her living room. When Mrs. Morehead asked the Defendant to leave, he struck her in the face with his fist and then shot both of the guests with a .22 semi-automatic pistol which he was carrying. Mr. Garrett was hit four times in the chest and died immediately. Mr. Butler was shot once in the chest and survived. The Defendant took their billfolds from the two fallen men and also took the keys to Mr. Butler's car. He then forced Mrs. Morehead to go with him in Mr. Butler's car. Mr. Butler recovered sufficiently to enable him to telephone the police. The Defendant and Mrs. Morehead were stopped by police in Brunswick soon after midnight. When the Defendant was unable to produce the registration to the car, the officers told him to get out of the vehicle. As he did so, the Defendant told the officers, "I'll make it easier for you. There is a gun under the front seat." The Defendant was arrested and the officers later searched the car and seized the gun.

The Defendant was indicted for felonious homicide in the penalty degree of murder in the death of Mr. Garrett and for assault with intent to kill for his shooting of Mr. Butler. The two charges were consolidated for trial in the Cumberland County Superior Court. Mrs. Morehead and Mr. Butler testified as to the events surrounding the shootings and a ballistics expert testified that three of the four bullets found in Mr. Garrett's body had been fired from the gun (damage to the fourth bullet made identification impossible) which was found under the driver's seat of the car in which the Defendant left the scene of the crimes. Medical evidence established that death resulted to Mr. Garrett when three bullets pierced the victim's heart and one struck his aorta.

The Defendant did not testify. He presented several witnesses whose testimony was concerned mainly with the events of Mrs. Morehead's relationship with the Defendant and with Mr. Butler during her husband's absences on naval duty and with the large quantities of alcoholic beverages

consumed by all the parties on the day of the shootings.

The Justice refused to submit the issue of voluntary manslaughter to the jury. He gave the jury the option of three possible verdicts as to Mr. Garrett's death—guilty of felonious homicide in the penalty degree of murder, guilty of involuntary manslaughter and not guilty. He reduced the charge as to the Defendant's attack on Mr. Butler to assault of a high and aggravated nature. The Defendant was a beneficiary of the jury's remarkable compassion and was found guilty of involuntary manslaughter as to Mr. Garrett's death and of simple assault upon Mr. Butler.

The Defendant has appealed both convictions, claiming as errors (1) the refusal of the Justice to suppress evidence of the gun which was found by a search of Mr. Butler's car and (2) the manner in which the Justice's instructions to the jury dealt with the principle of self-defense.

*The refusal of the Justice to suppress evidence of the gun found in a search of Mr. Butler's car*

The Presiding Justice conducted a hearing on the Defendant's Motion to Suppress before the trial commenced. Throughout this hearing the State insisted that the Defendant had no right to lawful possession of the car and, thus, had no standing to object to the search. The Defendant took the position that the Defendant's possessory status as to the car was irrelevant.

After hearing the testimony of several witnesses, the Justice denied the motion to suppress "upon the authority of Chambers v. Maroney, 399 U.S. 42 (1970)".[1] He made no ruling as to the Defendant's standing to object. The trial then commenced and the testimony of several witnesses was heard by the jury. Some of this testimony suggested the existence of additional facts which might be relevant to the validity of the search. The Justice then excused the jury, re-opened the suppression hearing and received additional testimony from several witnesses. At its conclusion he again ruled that the search was valid under the principles announced by Chambers v. Maroney, supra. As before, he made no ruling as to the State's contention that the Defendant lacked standing to object to the validity of the search. The gun was admitted into evidence.

The final ruling which the Justice made on the motion to suppress was based upon testimony which had been presented to him during the first suppression hearing, the completed portion of the trial and the second suppression hearing. This consisted of the testimony of the surviving victim, Mr. Butler, of various police officers who had examined the scene of the shooting, who had participated in the stopping and securing of Mr. Butler's car and who arrested the Defendant, as well as medical and other testimony concerning the wounds suffered by the two victims. The testimony that the Justice had heard relevant to the suppression issue may be summarized as follows:

Mr. Butler testified concerning the Defendant's sudden appearance in Mrs. Morehead's house and the Defendant's immediate unexplained shooting of Mr. Butler and Mr. Garrett. He testified that as he lay on the floor, partially conscious, he heard Mrs. Morehead screaming and felt someone going through his back pocket and removing his wallet. And then he heard his car starting up and leaving. Both Mrs. Morehead and the Defendant had disappeared. When he was able to get to his feet, he called the police on the telephone and reported the incident. Then he walked out to the edge of the highway to await the arrival of the police.

The police testimony revealed that they found Mr. Butler, seriously wounded, at the highway and Mr. Garrett, dead inside the house, with several empty .22 cal. shells

1. Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

lying on the floor. The police learned from Mr. Butler the make and registration number of the car and the name of the Defendant. Roadblocks were established and at about midnight Mr. Butler's car was stopped by the police. Mrs. Morehead immediately jumped out of the car and ran to the police cruiser. When the Defendant was unable to produce a registration certificate to the car, the police ordered him out of the car and the Defendant then made the statement, "I'll make it easier for you. There is a gun under the front seat." The Defendant was arrested and taken from the scene and an officer was left to keep the car secure. During the interval before the car was towed away to a garage where it was locked to await the arrival of State Police specialists who searched it at about 4:30 a. m., two other police officers had opened the car door and leaned in to verify the presence of the gun under the front seat.

Mrs. Morehead testified very briefly at the first hearing to suppress.[2] She said that upon the Defendant's sudden appearance at her home he struck her a severe blow in the face which dazed her. He took Mr. Butler's car keys which were lying on the dishwasher and forced her to go with him in the car, leaving Mr. Butler "laying on the floor". She testified that Mr. Butler had left the car with her for her use during that summer while he was overseas and she had permitted the Defendant to use the automobile on several occasions during that time. Upon Mr. Butler's arrival back in Maine, a week before, she had returned the car to him. Mr. Butler was not present at the time of the first hearing and it was stipulated that if he were present he would testify that he was the owner of the car; that he did not give the Defendant permission to use it; and that he did not give police permission to conduct a search of it. His testimony later at trial disputed none of these facts. There was no testimony, whatever, to the

effect that the Defendant had any lawful authority to use Mr. Butler's car that night.

At the conclusion of the second hearing on the motion to suppress, the Justice again found that the police had adequate probable cause to search the car, that the search at 4:30 a. m. was a valid search under the principles announced by Chambers v. Maroney, supra, and that its validity was unaffected by the two prior limited searches. Again, the Justice made no reference to the State's contention that the Defendant lacked standing to object to the search.

 This standing issue is properly before us. The State has persisted in this position throughout the hearing and the appeal. The fact that the Presiding Justice chose to base his denial of the motion on one of two alternate gounds urged by the State does not foreclose the State's contention as to the other ground. On this record, a finding that the search was valid carries no implication that the Justice must also have found that the Defendant had standing to raise the issue of validity.

The United States Supreme Court in Jones v. United States, 362 U.S. 257, 80 S. Ct. 725, 4 L.Ed.2d 697 (1960) examined the qualifications necessary to give a defendant standing to move to suppress as "a person aggrieved by an unlawful search and seizure" under Rule 41(e) of the Federal Rules of Criminal Procedure, in the light of the Constitution's prohibition against unreasonable searches and seizures. The Court said:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure di-

2. Mrs. Morehead's more extensive trial testimony had not taken place when the Justice

ruled upon the Defendant's motion to suppress the gun.

rected at someone else. Rule 41(e) applies the general principle that a party will not be heard to claim a constitutional protection unless he 'belongs to the class for whose sake the constitutional protection is given.'" 362 U.S. at 261, 80 S.Ct. at 731, 4 L.Ed.2d at 702.

The Court ruled that (1) in cases where the indictment is one which charges possession, the defendant is "in a very real sense" a person aggrieved by the search and seizure, and (2) the interest in the searched premises which gives standing to object to the introduction of the fruits of the search extends to one who is *legitimately on the premises where the search occurs.*

Shortly thereafter, in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the United States Supreme Court made applicable to state trials the rule excluding evidence which had been obtained as a result of an illegal search and seizure by the police. The purpose of the rule, the Court said, repeating its statement made a year earlier in Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed. 2d 1669, 1677 (1960), "is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." 367 U.S. at 656, 81 S.Ct. at 1692, 6 L.Ed.2d at 1090.

Our understanding of the areas constitutionally protected and the standing to object was further clarified by Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576, 583 (1967) and later by Mancusi v. DeForte, 392 U.S. 364, 368, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154, 1159 (1968) where the Court said that

". . . capacity to claim the protection of the Amendment depends not upon a property right in the invaded place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion."

This broadening of the protected area did not limit the application of the principle of standing and it was repeated the next year:

"The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." Alderman v. United States, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176, 185–186 (1969).

Our own Court examined the implications of Jones v. United States, supra, and decided that a trespasser, occupying a cabin without the knowledge or permission of the owners, had no standing to complain if officers searched the cabin with or without a warrant, quoting the language of *Jones*:

" 'This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched.'" State v. Coty, Me., 229 A.2d 205, 214 (1967).

Two years later, in State v. Cadigan, Me., 249 A.2d 750, 753 (1969) we accepted the *Jones* pronouncement as limiting standing to invoke the Fourth Amendment guarantees against unreasonable searches and seizures to

"(1) persons against whom the search was directed, (2) persons legitimately on the premises searched against whom the fruits of the search are intended to be used, or (3) persons charged with illegal possession of the property seized and sought to be suppressed."

When we spoke of "persons against whom the search was directed" we were speaking of persons who have reasonable and justified expectations that, because of their ownership, the nature of their occupancy or other possessory right, or their lawful presence on the property, their privacy in the area will not be disturbed—not of persons who were merely those against whom the police expected to use the evidence sought.

In these two cases our Court was considering facts bearing upon standing to object to searches of real property. We are unable to justify distinguishing in this respect between standing to object to searches of buildings and standing to object to searches of automobiles.

We are aware that several Federal Circuit Courts of Appeals have taken a contrary position as to a thief's standing to object to a warrantless search of the automobile he is charged with transporting in interstate commerce. The Judges of the 10th Circuit held in Simpson v. United States, 346 F.2d 291 (10th Cir. 1965) that the sole prerequisite to a defendant's raising the Fourth Amendment issue is that he claim a proprietary interest in the searched property. (There, the thief had attempted to sell the car as his own.) On petition for rehearing, the Court also pointed out that

"a jury may infer from the possession of a recently stolen automobile in another state that the possessor of the vehicle knew it was stolen and that he transported it in interstate commerce."

Thus, the Court said, the charge of transportation of a stolen vehicle in interstate commerce is really a prosecution "turning on illicit possession", creating the dilemma which the United States Supreme Court in *Jones* said is a "possession [which] both convicts and confers standing". 362 U.S. at 263, 80 S.Ct. at 732, 4 L.Ed.2d at 703.

The Judges of the 9th Circuit applied the same reasoning in Cotton v. United States, 371 F.2d 385 (9th Cir. 1967) where the defendant was also charged with interstate transportation of a stolen vehicle. We do not quarrel with this reasoning as applied to cases where the charge is essentially that the defendant was illegally in possession of the object seized. In fact, we announced in *Cadigan* that such a defendant always has standing to question the search.

The Circuit Court in *Cotton,* however, added an additional ground in support of its holding that the car thief had standing. Although acknowledging that the language of *Jones* would deny standing to one whose presence on the searched premises was wrongful, the Court of Appeals construed this language as not intended to apply to the wrongdoer who has actually taken possession of the premises. Even the thief, the Court reasons, has a limited proprietary interest in the property he possesses. He is entitled to protection against all who do not have a paramount right to possession and he may even gain title by adverse possession against the owner.

In Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) the petitioners were convicted of the crime of interstate transportation of stolen goods, largely upon evidence obtained by the recovery of some of the stolen merchandise as a result of a search of the store owned by their co-defendant. The search was made while the petitioners were under arrest in another state. The warrant authorizing the search was held to be invalid and the evidence thus obtained was ordered suppressed *as to the defendant store owner* who had a proprietary interest in the property searched. However, the United States Supreme Court upheld the District Court's ruling that the *petitioners* had no standing to seek to suppress the articles seized.

The Court discussed the dilemma recognized in *Jones* which would face a defendant charged with an unlawful possession who would need to claim possession in order to contest a seizure when such a possession was also the basis of the charge against him. The Court left unanswered the question whether the elimination of this dilemma by the doctrine announced in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (barring the prosecutor from using against a defendant at trial any testimony given to establish standing to move to suppress) makes the *Jones* rule of "automatic stand-

ing" in possession cases now unnecessary. The Court said:

> "In deciding this case, therefore, it is sufficient to hold that there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) had no proprietary·or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure. The vice of allowing the government to allege possession as part of the crime charged, and yet deny that there was possession sufficient for standing purposes, is not present. The government cannot be accused of taking 'advantage of contradictory positions.' " 411 U.S. at 229, 93 S.Ct. at 1569, 36 L. Ed.2d at 214.

In our own case, we have a defendant who was not in the car at the time of the search,[3] who had no proprietary or possessory interest in the car and who was not being charged with possession of the gun which he was attempting to suppress. In these three basic respects our facts equal those upon which the United States Supreme Court denied standing in *Brown*.

■ Of course, the states are free to grant more liberalized criteria as to standing than that made applicable to state prosecutions under Mapp v. Ohio. The California Court, for example, adopted the federal exclusionary rule before it was mandated by *Mapp* (People v. Cahan, 44 Cal.2d 434, 282 P.2d 905, 50 A.L.R.2d 513 (1955)) and saw fit to declare evidence illegally obtained to be inadmissible whether or not it was obtained in violation of a *particular* defendant's rights. People v. Martin, 45 Cal.2d 755, 290 P.2d 855 (1955).

The majority of the decisions which have come to our attention appear to hold to the concept that the trespasser is without standing to object to the introduction of the fruits of the search.

The United States Supreme Court has clearly not felt that the prophylactic purposes of the exclusionary rule require the extension of its benefits to those defendants who were not included in *Jones* as having standing to attack the propriety of the search. We ourselves do not consider that the desired deterrent effect of the exclusionary rule needs further strengthening in Maine by granting to the thief a new standing to object to the search of the car he has stolen.

We find the great weight of authority denies standing to the trespasser on real property (except where the charge is one of unlawful possession which, under *Jones*, and our own *Cadigan*, provides an automatic standing). United States v. Miller, 145 U.S.App.D.C. 312, 449 F.2d 974 (1971); United States v. Thomas, 342 F.2d 132 (6th Cir. 1965). We are unconvinced that any different principle should apply as to standing to object to the search of an automobile. The majority of the reported cases so hold although their reasoning is not uniform.

In United States v. Kucinich, 404 F.2d 262 (6th Cir. 1968) standing was denied a car thief where the police had probable cause to believe that the car was stolen and when the search took place after the police had arrested and removed the defendant driver from the car. The Court emphasized that in such a situation the police had custody of the car on behalf of the owner. The privacy of the thief was not invaded by the search as he had already been taken to jail.

In Rodgers v. United States, 362 F.2d 358 (8th Cir. 1966) the state police had ar-

---

3. We do not mean to suggest that the presence or absence of the thief from the premises searched will necessarily be a controlling circumstance. It is sufficient to say here that there is nothing to suggest that the defendant's arrest and removal from the scene was for a surreptitious purpose of allowing a search in his absence.

rested the defendant for car theft. After he was in jail, a warrantless search of the car by federal officers revealed a sawed-off shotgun which was contraband under federal law. The defendant was denied standing to object to the search and the seizure of the gun, the Court saying in explanation:

> "And it reposed in a vehicle which was stolen, which was no longer in the defendant's possession, and which, at the time the gun was first seen and taken, had come into the custody of the state troopers as a car which the defendant was not authorized to possess." 362 F. 2d at 362.

The Nevada Court (Osborne v. State, 82 Nev. 342, 418 P.2d 812 (1966)) had before it the lower court's denial of a motion to suppress involving facts similar to our own. The defendant had murdered two people and had driven away from the crime in their car. A parking lot attendant parked the car for the defendant and noticed a pool of blood on the floor in the rear of the car. Police were called and the car was searched without a warrant in defendant's absence. Evidence incriminating the defendant in the murder was discovered. The Court's holding was not grounded on the defendant's absence from the car at the time of the search, but rather was a clear pronouncement that because the defendant did not own the automobile and was not shown by the record to have any right to its possession, he had no standing to object to the search. This rule was later followed as to the passenger in a stolen automobile in Harper v. State, 84 Nev. 233, 440 P.2d 893 (1968).

The facts in State v. Pokini, 45 Haw. 295, 367 P.2d 499 (1961) were much like our own. The defendant had robbed the victim, and had driven away in the victim's car with the victim, a hostage, lying on the floor in back. An officer stopped the car to question the defendant about an unrelated burglary. He conducted a warrantless search of the car and found two guns which the defendant attempted to have suppressed. The Court ruled squarely that

> " . . . a trespasser who places his property where it has no right to be has no right of privacy as to that property. The situation being one in which he has no right of privacy he has no standing. Only the invasion of privacy is protected by the Constitution, as held in Jones." 45 Haw. at 315, 367 P.2d at 509.

As we noted above, the test which the United States Supreme Court applied in *Brown* to deny petitioners' standing to object to the search of a store, if applied to the facts of the case now before us, would lead to a similar denial of Defendant's standing to object to the search of the automobile. But more particularly, we have a Defendant who had stolen [4] the victim's car and was using it for the criminal purpose of escaping with a hostage from the scene of the crime when he was stopped by the police. Granting the correctness of the assertion of the *Cotton* court that even a thief can gain a limited proprietary interest in the property he has stolen (although we are unwilling to agree that he can gain such an interest while using the property for a criminal purpose), we think that *Jones* made clear that common law concepts of property interests are not controlling as to standing. It seems to us that the question which determines the thief's standing is not whether he has gained some proprietary interest in the property greater than that of anyone but the true owner but, rather, whether the search was of an area where, under all the circumstances, the thief had a reasonable expectation of freedom from governmental intrusion.

The answer must be that this Defendant, escaping the scene of the crime with a hostage, in a car stolen from his

---

4. For the present purposes we do not distinguish between larceny (17 M.R.S.A. § 2101) and the offense of using a motor vehicle without the owner's consent (29 M.R.S.A. § 900). *See* State v. Gordon, Me., 321 A.2d 352 (1974).

victim, had no expectation of privacy which the law is willing to recognize as reasonable. In fact, it is apparent that even he, himself, did not subjectively consider that he had such an expectation as to the stolen vehicle. He announced to the officers, "I'll make it easier for you. There is a gun under the front seat."

We note that in some of the cases denying standing to the car thief, the opinions emphasize that the police had probable cause, at the time of the searches, to believe that the cars were stolen. In our own case, while it appears likely that the wounded victim who had given the police a description and the registration number of this car had also told the police that the assailant had taken the car without right (from which it could have been held that when the police seized the car they were recovering it for the owner, as in United States v. Kucinich, supra), the evidence does not reveal this. However, we conclude that a defendant's standing to object should not depend upon the state of the officer's belief as to the thief's possessory interest in the vehicle to be searched. To hold otherwise would appear to us to be adding to the exclusionary rule a new and unneeded dimension which the United States Supreme Court has not demanded.

The Defendant was without standing to object to the introduction into evidence of the fruits of the search of his victim's car.

The Justice was not in error in denying the motion to suppress. Thus, we do not reach the Defendant's claim that the search was unjustified.

*The Presiding Justice's reference to self-defense in his instructions to the jury*

The Presiding Justice began his explanation of the elements of the offense of felonious homicide by explaining that, to convict, the jury must be satisfied that the physical acts which caused death were the results of an exercise of the defendant's will, as opposed to reflex, nonvolitional acts. He then told the jury that the killing must have been proved to be an *unlawful* killing, saying:

"If you conclude beyond all reasonable doubt that the defendant killed Donald Garrett, you should then consider whether the killing was unlawful. Every voluntary killing which is neither justifiable nor excusable is an unlawful killing. A killing is justifiable if it is necessary to performance of a legal duty or to the exercise of a legal right. For example, a killing in self-defense may be considered justifiable. A killing is excusable when done by accident while performing a lawful act without criminal negligence. For example, if I should be chopping wood with a hatchet and the head should accidentally fly off the hatchet and kill my neighbor, that would be an excusable killing."

The Justice did not submit an issue of self-defense to the jury.

After the jurors had deliberated several hours they requested further instructions as to the "elements to be proved in each crime". The Justice complied with this request and, in particular, he used the following language to describe the concept of an unlawful killing:

"If you conclude beyond a reasonable doubt that the defendant killed Donald Garrett, you should then consider whether the killing was unlawful. Every voluntary killing which is neither justifiable nor excusable is an unlawful killing. A killing is justifiable if it is necessary to the performance of a legal duty or to the exercise of a legal right. *And, I gave you as an example a killing done in self-defense, that may be justifiable. There is no evidence of self-defense in this case, ladies and gentlemen.*" (Emphasis added.)

Except for the italicized passage, he repeated verbatim the language he had previously used. Only the words, "There is no evidence of self-defense in this case", were a new concept. The Defendant's counsel made timely objection to the Justice's introduction of this additional observation, stating that while he agreed with the Justice's statement that the jury had heard no evidence that the Defendant had acted in self-defense, the question of whether he had acted in self-defense was for the jury to decide. He added that the Justice's statement to the jury that there had been no evidence of self-defense unduly emphasized its absence. Now, on appeal, the Defendant urges us that the Justice's later instruction was a direct contradiction of his original instructions and must have been confusing to the jury and he now maintains, after further reflection, that he believes there was sufficient evidence to justify a jury finding that the Defendant acted in self-defense.

■ There was no conflict whatsoever between the two explanations of the concept of an unlawful killing. We see no possibility that the Justice's supplemental instruction could have confused the jury or unduly emphasized the absence of self-defense. It seems abundantly clear that in both instructions the Justice used the concept of self-defense only as an example of circumstances which would make a killing *justifiable* and, therefore, not unlawful— exactly as he used the example of a hatchet head flying off accidently as a circumstance which would make a resulting death an *excusable* killing. As to his supplemental instruction, the Justice told counsel at sidebar that he sought to avoid any possibility that the jury might interpret his use of the example of self-defense as a suggestion by him that here had been evidence of self-defense. (He obviously considered the hatchet head example to be sufficiently remote from the facts as to constitute no possible danger of misunderstanding.)

■ The Justice was not in error in not submitting the issue of self-defense to the jury. We reconsidered our position as to the defense of self-defense in State v. Millett, Me., 273 A.2d 504 (1971). We were at that time fully aware of the holding in In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) which made clear the responsibility of the State to prove every fact necessary to establish the crime charged beyond a reasonable doubt. We reaffirmed then the State's burden to prove the element of unlawful killing but concluded that evidence to establish the *absence* of various possible specific situations of justification need not be presented by the State until such an issue has been generated by the testimony. We said:

"Since the claim of justification by self-defense is not raised by plea, it need not be anticipated by the State but will enter the case as an issue only if and when substantial evidence bearing on the issue is introduced, from whatever source that evidence may come. *In that sense only can it be said that the defendant has a burden,* the burden of coming forward with evidence of justification which will generate the issue and justify a finding by the factfinder, if indeed one is made, that by reason of the claimed justification a reasonable doubt exists as to defendant's guilt. As has frequently been stated, the defendant's burden under these circumstances is purely procedural and there is no occasion for instructions to the jury with respect to it.

\* \* \* \* \* \*

. . . [T]he trial court should not give instructions on the law of self-defense nor submit the issue for jury consideration unless and until there is substantial evidence, which, when viewed in the light most favorable to the defendant, would, if believed, permit the jury to entertain a reasonable doubt of guilt based upon a claim of self-defense." *273 A.2d at 508, 510.*

We are still unconvinced that our policy decision in *Millett* is in any way violative of the principle that the State must prove all the essential elements of an unlawful homicide. Here, the testimony was completely bare of anything which even suggested that the Defendant acted in self-defense when he shot his two victims. The Justice determined as a matter of law that the issue of self-defense had not been generated for jury consideration. We are satisfied that he acted correctly in withholding this issue from the jury.

The entry will be:

Appeals denied.

All Justices concurring.