## COMMONWEALTH *vs.* JAMES McALISTER.

Suffolk.     April 1, 1974. — June 12, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & WILKINS, JJ.

*Homicide.  Jury and Jurors.  Constitutional Law,* Due process of law.
*Practice, Criminal,* Capital case, Examination of jurors, Charge to
jury. *Evidence,* Court Record. *Insanity.*

In a case tried prior to *Furman* v. *Georgia,* 408 U. S. 238, where the
defendant was convicted of murder in the first degree and the jury did
not recommend that the sentence of death be not imposed, there was
no error in excusing from jury service for cause veniremen whose
opposition to capital punishment would preclude them from finding
the defendant guilty regardless of the evidence; this court was not
persuaded on appeal that such exclusion resulted in a jury with a
"conviction-prone" bias and that the defendant was deprived of his
constitutional right to a jury which could fairly and objectively
determine his guilt or innocence on the evidence. [457-462]

Alleged error at a criminal trial in permitting a question of the prosecutor
to the defendant containing a part of a record of his conviction of a
misdemeanor was not prejudicial where the question was withdrawn
and unanswered, the part read was not so "powerfully incriminating"
as to nullify the judge's instruction to disregard it, and the Com-
monwealth's evidence was overwhelming. [462-463]

At the trial of a capital case, where the defendant contended that he was
not responsible for his acts because of some drug placed in his coffee
without his knowledge, the judge's fair and complete charge plainly
indicated that if the defendant lacked substantial mental capacity as
delineated in *Commonwealth* v. *McHoul,* 352 Mass. 544, for any
reason save voluntary intoxication, he had a complete defence; there
was no error in the judge's refusal to give the defendant's requested
instruction on mental disease resulting from involuntary intoxication
as a defence. [463-464]

INDICTMENTS found and returned in the Superior Court
on March 22, 1971.

The cases were tried before *Hudson, J.*

*William P. Homans, Jr.,* for the defendant.

*John T. Gaffney*, Assistant District Attorney (*James M. McDonough*, Legal Assistant to the District Attorney, with him) for the Commonwealth.

REARDON, J. The defendant was convicted of murder in the first degree, armed robbery, and unlawful possession of a firearm. There was no recommendation by the jury that the death penalty be not imposed. A sentence of life imprisonment was imposed on the armed robbery conviction and a sentence of from two and one-half to four years on the firearm conviction. The defendant's appeal is before the court pursuant to G. L. c. 278, §§ 33A-33G.

Only a brief summary of the evidence presented at trial is required. The principal witness for the Commonwealth was Florence Piper, whose testimony was substantially as follows. She was acquainted with the defendant on February 26, 1971, and on that date she was with him in the Shanty Lounge in Boston until about 10:30 P.M., at which time they left the lounge and took a taxicab presumably to attend a party. She noticed that the cab driver, who had told them he was unfamiliar with the area, seemed to be taking them in the wrong direction. The defendant then said, "They are just trying to take our money." He next gave the driver other directions and then ordered him to stop. At this point the defendant put a gun through an opening in the partition between the front and back seats and shot the driver in the head. The defendant proceeded to climb into the front seat where he searched the driver. Hearing the driver moan, he returned to the rear seat where he shot the driver twice more in the same fashion. He went back to the front seat and handed Piper some articles, including a money clip which he had taken from the driver. On seeing a man emerge from the building in front of which the cab was parked, the defendant said he would kill him also but, on Piper's protest, agreed not to do so, saying, "All right, but I don't need no witnesses." The man who had left the building got into a car and drove up beside the cab. There was a short conversation between the two men, after which the second man left. Piper and the defendant then took another cab to Louie's Lounge, where the defendant

wiped blood off his clothes and Piper's. Piper gave the defendant the articles taken from the driver. He returned the money, twenty-six one dollar bills, and left the lounge temporarily, saying he intended to dispose of the other items. Later in the evening Piper divided the money evenly with the defendant. After leaving Louie's Lounge, Piper and the defendant went to another bar, from there to the home of Piper's brother, and finally to the defendant's apartment. A few days later the defendant said to the witness that she "had seen him wipe somebody off the face of the earth and that he would do the same thing to . . . [her]."

There was also evidence from one Otis B. Cash, Jr., who testified that he was at the location described by Piper as the scene of the shooting that night, heard gunshots, and had a discussion with a man in a taxicab whom he identified as the defendant. Cash stated that there was a woman in the back seat and a man slumped over in the driver's seat and that the defendant had told him that all three had been to a party. There was further evidence that the body of Robert G. Foster was found in the taxicab he operated at the same location that evening. There were three gunshot wounds in the body, one in the head and two in the neck. There was expert testimony that a fingerprint found on the door handle of the taxicab was that of the defendant.

The defendant testified that he had spent the evening at the Shanty Lounge with Piper and that while there he had consumed a cup of black coffee. Shortly after finishing the coffee, he began to hear buzzing sounds, saw flashing lights and shadows, and felt an aching in his head. He recalled leaving the lounge with Piper in a taxicab but remembered nothing further until he was in Louie's Lounge later that night. The defendant also presented expert psychiatric evidence that the symptoms described by the defendant were consistent with a reaction to LSD. There was rebuttal testimony by an expert psychiatric witness for the Commonwealth who had examined the defendant on April 2, 1971. He stated that at that time the defendant had told

him that he remembered the events of the night in question but that he had felt drugged. In response to a hypothetical question, this witness testified that the actions of the defendant alleged by the Commonwealth appeared to be purposeful and not a toxic reaction.

The defendant argued three assignments of error. We discuss each.

1. Error is alleged in the excusing for cause of prospective jurors because of their answers to questions on their opinions on the death penalty. Since the case was tried prior to the decision of the Supreme Court of the United States in *Furman* v. *Georgia*, 408 U. S. 238 (1972), there appeared to exist at that time a possibility that conviction of the defendant would result in imposition of a death sentence. In these circumstances it was proper to inquire of the veniremen pursuant to G. L. c. 278, § 3, whether they held opinions which might preclude them from finding the defendant guilty.

The principal argument of the defendant is that, in excluding those potential jurors[1] who on voir dire revealed opinions which they felt would preclude them from a finding of guilty even if otherwise convinced by the evidence beyond a reasonable doubt, the resulting jury was "conviction-prone." A similar argument has been made before the Supreme Court of the United States. In *Witherspoon* v. *Illinois*, 391 U. S. 510 (1968), the court held that the exclusion for cause of veniremen who held a fixed opinion against the death penalty resulted in a jury which was unfair to the defendant *in its determination of the proper punishment*. Given the ruling in *Furman* v. *Georgia*, *supra*, and our disposition of the death sentence imposed in this case, that holding is plainly irrelevant. However, the court

[1] Our reading of the transcript of the voir dire indicates that three potential jurors were excused for cause as a result of answers to the questions put as to their opinions on capital punishment. Exceptions were taken, but the defendant's assignment of error on appeal mentions only one such case, although there is transcript reference in the assignment to another. In any case, pursuant to our broad duty to review the entire case in capital cases, we have considered all three exclusions. G. L. c. 278, § 33E. *Commonwealth* v. *McCauley*, 355 Mass. 554, 562 (1969). A fourth juror was excused because he had apparent conscientious scruple about the punishment of life imprisonment.

was also asked to decide whether the exclusion of jurors opposed to capital punishment resulted in jurors who possessed social and personal characteristics which made them more likely to be favorably disposed to the prosecution in a criminal case. Thus it is argued that such a "death-qualified" jury would be biased not only on the question of punishment but on the question of guilt or innocence as well. The Supreme Court refused to accept this contention. In dicta in the *Witherspoon* case, and by a specific holding in *Bumper* v. *North Carolina*, 391 U. S. 543 (1968), the court indicated that there was not sufficient evidence to support the theory that jurors who were not opposed to capital punishment would be less than fair on the separate question of guilt or innocence. The court found the empirical studies presented to it unconvincing although it indicated that if more persuasive evidence were adduced of the claimed correlation the argument might be received more sympathetically. *Witherspoon* v. *Illinois*, *supra*, at 516-518. *Bumper* v. *North Carolina*, *supra*, at 545. Since the decisions in the *Witherspoon* and *Bumper* cases, this court has been presented on several occasions with arguments challenging the fairness of juries from which were excluded for cause veniremen with varying attitudes against the death penalty. In each case we have rejected these arguments, e.g., *Commonwealth* v. *Sullivan*, 354 Mass. 598, 608-609 (1968), cert. den. 393 U. S. 1056 (1969), denial of habeas corpus affirmed, *Sullivan* v. *Scafati*, 428 F. 2d 1023 (1st Cir. 1970); *Commonwealth* v. *Connolly*, 356 Mass. 617, 621-623 (1970), cert. den. 400 U. S. 843 (1970); *Commonwealth* v. *Mangum*, 357 Mass. 76, 77-80 (1970); *Commonwealth* v. *Bumpus*, 362 Mass. 672, 679 (1972), judgment vacated on other grounds, 411 U. S. 945 (1973); *Commonwealth* v. *Lussier*, 364 Mass. 414, 425 (1973). We reaffirm those holdings. Nothing we have seen persuades us that the exclusion for cause of the jurors in this case deprived the defendant of a jury which could fairly and objectively determine his guilt or innocence on the evidence in conformity with their sworn oath. G. L. c. 278, § 4.

The questions put by the trial judge to the veniremen in this case dealt not with their general attitudes toward capital punishment but with the influence of those attitudes on their ability to appraise the evidence fairly. The trial judge explained to each potential juror the alternative punishments possible for murder in the first degree and then inquired substantially as follows: "If you should be sworn as a juror in a case where the penalty might be death and you should be convinced by the evidence beyond a reasonable doubt of the guilt of the defendant, have you an opinion that would prevent or preclude you from doing your sworn duty of finding a defendant guilty?"[2] This formulation, taken largely from G. L. c. 278, § 3, does not exclude any juror merely because of his attitude on the death penalty. It is entirely possible that a potential juror might have deeply held conscientious scruples against capital punishment and still be able to answer honestly the quoted question in the negative. The judge's questioning was carefully directed only at the ability of the potential jurors to act objectively on the basis of the evidence. In fact the judge declared indifferent two, and possibly three, potential jurors who expressed personal opposition to the death penalty but who believed they could fairly judge the evidence notwithstanding those opinions.[3] In the case of each juror excused for cause, the judge took pains to assure that the attitudes expressed were more than just personal convictions and that they would interfere with the jurors' capacity to perform their duty.[4]

---

[2] The quoted passage was given to juror No. 402. Substantially similar questions were put to the two others.

[3] Two of these jurors were peremptorily challenged by the Commonwealth.

[4] The following colloquy between the judge and juror No. 428 was typical of his examination of all three excused jurors.

Q. "Now, if you were chosen as a juror to sit on a capital case, having in mind those possible verdicts, have you an opinion which prevents you from doing your sworn duty of finding the defendant guilty?"

A. "I don't believe I would under those conditions."

Q. "Now, tell me why you feel that way."

A. "If the situation were to progress to a state where it was an either/or situation, I don't think I could go to the latter two punishments."

It may be argued, of course, that although the inquiries made did not exclude jurors who were opposed to the death penalty, they did eliminate those whose opposition was strongest and that the resulting jury was still skewed toward conviction if there is a correlation between death penalty attitudes and the tendency to convict. We do not agree.

First, we are not persuaded that the empirical studies proffered by the defendant provide much more cogent evidence than that which the Supreme Court found lacking in the *Witherspoon* case. Three "new" studies are cited by the defendant.[5] Two of these have already been brought to

Q. "How deep rooted is this feeling of yours concerning the death penalty?"

A. "Fairly deep."

Q. "Well, in what period of time have you developed this opinion or entertained it?"

A. "Well, seriously over the last five years where I have been able to maintain, how should I say, a valid opinion."

Q. "Would it make any difference to you if I told you that it was the law of the Commonwealth that such a sentence could be imposed as the death sentence?"

A. "No. I believe you when you say there is a law to that extent, but I don't necessarily have to agree with it."

Q. "Would that change your mind if I told you it was the law? In other words, I gather that you don't believe in capital punishment."

A. "No."

Q. "Am I right about that?"

A. "You are right about that."

Q. "Well, what if it was the law of the Commonwealth, would that change your mind any?"

A. "What type of law?"

Q. "If it was the law of the Commonwealth that such a sentence could be imposed, would that change your mind any?"

A. "No, not necessarily. The law is the law, and you know, it doesn't matter."

Q. "If you were sitting as a juror, is your feeling so deep rooted that you could not follow the law in that case?"

A. "No, I don't believe I could."

THE JUDGE: "You are excused, Mister. You may step down."

[5] Bronson, On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen, 42 U. of Colo. L. Rev. 1 (1970). Jurow, New Data on the Effect of a Death Qualified Jury on the Guilt Determination Process, 84 Harv. L. Rev. 567 (1971). White, The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries, 58 Cornell L. Rev. 1176 (1973).

our attention when the same argument was made to us in *Commonwealth* v. *Bumpus*, 362 Mass. 672 (1972). We have examined these studies and are unprepared to say that they so clearly demonstrate a conviction-prone bias in "death-qualified" juries as to make trials before such juries constitutionally defective. These studies freely acknowledge the methodological defects inherent in such experiments. The most serious difficulty, of course, is that all of these studies were outside of actual trials. No such simulated cases can reproduce the great responsibility which exists when "in the solemnity of a court room a defendant is tried and his reputation and his liberty or his life are at stake." *Commonwealth* v. *Blackburn*, 354 Mass. 200, 204 (1968). The nature of the statistical evidence offered is not such as to shake our fundamental conviction that juries generally are capable of impartially carrying out their tasks of evaluating the evidence and arriving at verdicts without regard to personal opinions.

Secondly, even if the tendency asserted by the defendant were proven, the injury to the neutrality of the jury which would result from the procedure followed in this case would be insubstantial and certainly not constitutionally significant. By excluding only those potential jurors whose opinions are such as to preclude a finding of guilty, an exceedingly small number are eliminated. These exclusions are, moreover, balanced by others when, as here and pursuant to our suggestion in *Commonwealth* v. *Ladetto*, 349 Mass. 237, 245 (1965), inquiry is also made as to whether veniremen had any opinions which would preclude them from recommending mercy, i.e., life imprisonment, for defendants convicted of murder in the first degree. Thus, those who demonstrate an extreme position in favor of the use of the death penalty may also be excluded for cause. If there is any validity to the asserted correlation between attitudes toward capital punishment and "conviction-proneness," then this method eliminates potential jurors at both extremes.

The fundamental difficulty with the defendant's contention, however, is that, were it to prevail, it would mean

that a trial judge would be unable to prevent the empanelling of a jury which he knew from the outset would be incapable of arriving at a verdict of guilty. Since unanimity is required for conviction, and since a judge would be forbidden from excusing jurors who declared an intention never to agree to a guilty verdict regardless of the evidence, the entire trial would be a fruitless exercise. "The . . . jurors in question were excluded because they did not stand indifferent, not because they had views or opinions for or against particular kinds of punishment. Neither party has the right to insist that such persons be allowed to serve as jurors." *Commonwealth* v. *Mangum*, 357 Mass. 76, 80 (1970).

The defendant has cited no case in any jurisdiction in which a court has accepted his thesis, and our research has discovered none. The cases to the contrary are legion. Besides the Massachusetts cases cited, a few of the more recent are: *United States* v. *Marshall*, 471 F. 2d 1051, 1053 (D. C. Cir. 1972); *Eli* v. *Nelson*, 360 F. Supp. 225, 227 (N. D. Cal. 1973); *People* v. *Maestas*, 183 Colo. 378, 385 (1973); *Wingfield* v. *State*, 231 Ga. 92, 93 (1973); *People* v. *Connolly*, 55 Ill. 2d 421, 428-429 (1973); *State* v. *Shepherd*, 213 Kans. 498, 506-507 (1973); *State* v. *Washington*, 283 N. C. 175, 182-183 (1973); *Fowler* v. *State*, 512 P. 2d 238, 245-246 (Okla. Crim. App. 1973); *Hunter* v. *State,* 496 S. W. 2d 900, 902 (Tenn. 1972); *State* v.*Trevino,* 10 Wash. App. 89, 92-94 (1973). There was no error in the selection of the jury.

2. During cross-examination of the defendant, the prosecutor read into the record part of a certified copy of a record of a 1961 conviction of one James McAlister for operating a motor vehicle without a license. The apparent purpose of this proposed evidence was to impeach the credibility of the defendant who had testified that he had never driven an automobile. The defendant argues that the reading of this record was prejudicial error because the offence involved was a misdemeanor which occurred more than five years before defendant's testimony, and the prosecution made no showing that the defendant had been convicted of a crime

within five years prior to the time of testifying. G. L. c. 233, § 21. He further charges error in that the prosecutor did not establish that the defendant was the same James McAlister named in the conviction record. *Ayers* v. *Ratshesky*, 213 Mass. 589, 594-595 (1913). In fact, however, the prosecutor withdrew the question of which the reading of the record was part before he finished reading the record. There was no answer. The judge instructed the jury to disregard the statement. In short there was nothing put in evidence. The defendant's credibility with regard to his earlier statement that he had never driven an automobile was far from the central issues of the trial. The part of the conviction read was not so "powerfully incriminating" as to cast doubt on the efficacy of the judge's curative instruction to the jury in the manner discussed in *Bruton* v. *United States*, 391 U. S. 123, 135-136 (1968). *Commonwealth* v. *Devlin, ante,* 149, 159-160 (1974). See *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 9-10 (1973). Moreover the evidence produced in this case was so overwhelming that "the jury would not have found the Commonwealth's case significantly less persuasive if those matters had been handled with more circumspection." *Id.* at 10. See *id.* at 9-10.

3. The defendant next argues that it was error for the judge to refuse to give a requested instruction to the effect that the defendant could not be found guilty if the jury found that at the time of the offence he was suffering from a mental disease or defect depriving him of the substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law if that disease or defect was the result of involuntary intoxication. We believe that the judge's charge on this point was adequate.

The judge first pointed out the defendant's implied contention that he was not responsible for his acts because of the sensations experienced from some drug that had been placed in his coffee without his knowledge. He next properly noted that voluntary intoxication would provide no defence except possibly to negate an inference of deliberate premeditation in a case of murder in the first degree.

*Commonwealth* v. *McGrath*, 358 Mass. 314, 319-320 (1970), and cases cited. He went on to present a clear and careful explanation of the defence of criminal irresponsibility as articulated in *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967). He then instructed the jury that, although it was the defendant who presented the evidence of his irresponsibility, the burden was on the Commonwealth to prove beyond a reasonable doubt that the defendant was criminally responsible for his acts although the jury could reasonably presume that the great majority of men are sane and thus responsible. *Commonwealth* v. *Ricard*, 355 Mass. 509, 512 (1969). *Commonwealth* v. *Costa*, 360 Mass. 177, 185-187 (1971). The judge then returned to the defendant's narration of his sensations on, and lack of memory of, the night of the offence, and once more summarized the test of the *McHoul* case. Taken as a whole, the charge plainly indicated to the jury that if they found the defendant lacked substantial capacity as delineated in the *McHoul* case, for any reason save voluntary intoxication, he had a complete defence. This was obviously connected to the asserted drug in the defendant's coffee. The charge was fair and complete. The defendant is entitled to no more. *Commonwealth* v. *Kelley*, 359 Mass. 77, 92-95 (1971).

4. Pursuant to our responsibility under G. L. c. 278, § 33E, we have carefully reviewed the entire record and are satisfied that the defendant received a fair trial and that the verdict of murder in the first degree was supported by weight of the evidence.

5. Since there was no recommendation that the death sentence not be imposed and the case was tried prior to *Furman* v. *Georgia*, 408 U. S. 238 (1972), the sentence of the court was death. The judgment against the defendant in so far as it imposes the death sentence is reversed, and the case is remanded to the Superior Court which is to resentence the defendant to life imprisonment. *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 14-15 (1973). Otherwise the judgments are affirmed.

*So ordered.*