STATE of Maine

v.

**Clark William RICE, Jr.**

Supreme Judicial Court of Maine.

Nov. 2, 1977.

Michael D. Seitzinger, Charles K. Leadbetter, Arthur A. Stilphen, G. A. Brennan, Asst. Attys. Gen., Augusta, for plaintiff.

Roberts, Shirley & Humphrey by Thomas E. Humphrey, James J. Shirley, Sanford, for defendant.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

In a consolidated trial upon three indictments returned in the Superior Court (York County) against defendant Clark William Rice, Jr., the jury, on January 10, 1976, found defendant guilty of (Simple) Assault and Battery (17 M.R.S.A. § 201), Armed Assault and Battery (17 M.R.S.A. § 201–A) and Armed Robbery (17 M.R.S.A. § 3401–A). Defendant has appealed from the judgments of conviction entered on the verdicts.

We sustain the appeals as to all three judgments of conviction.

At approximately 6:30 p. m. on April 12, 1975 defendant and his wife Brenda were married. Later that evening the events occurred which led to the convictions now under review.

For several months before their marriage defendant and his then fiancee, Brenda, had been living in a tent at the residence of Mr. and Mrs. Thomas Eagle, Jr. Defendant worked for Mr. Eagle and the two couples were also social friends. The Rice wedding, a small family affair, was held in the Eagle home in North Berwick. A short reception of an hour or so followed the ceremony.

Some friends, among whom were Edwin Elton, David Hanscomb and Kevin Swett, arrived during the reception. Defendant had already been drinking hard liquor, and after the arrival of his friends, he began to drink more heavily. Sometime between 8:00 and 9:00 p. m. defendant and his wife, together with Hanscomb and Elton, decided to leave the Eagles' home. When they so informed Mr. Eagle, Eagle told defendant, who was already intoxicated, that he was going to sleep, and if defendant was "really high" when he returned, he should stay out of the house.

Defendant, his wife and friends then left in David Hanscomb's car for a drinking spot, known as the "quarter mile", situated in the woods a short distance from the Eagle home. They were there joined by Swett and Linwood Collins, another acquaintance. During the rest of the evening, defendant consumed both marijuana and beer. At one point, Hanscomb and Elton furnished defendant with a can of beer from Hanscomb's car and, along with Swett and Collins, they dared defendant to drink the whole can at once. Reluctant at first, defendant eventually drank it.

The group returned to the Eagle residence at approximately 10:30. Soon, the guests left the newlyweds alone. There is confusion about the condition of defendant thereafter as well as about subsequent events.

Apparently, defendant obtained a kitchen knife and cut Thomas Eagle slightly with it when Eagle tried to take a gun from defendant. Defendant's wife testified that defendant suddenly became a disoriented, violent person who did not recognize her. Mrs. Rice said that defendant's pupils were dilated and his movements shaky. Mr. Eagle described defendant as "confused." Defendant either asked or dared the others to call the police, and when they did not respond, defendant himself called the police.

It appears, too, that defendant went outside the house with the gun after phoning the police and that Elmer Hutchins and Charles Dubois, local police officers, arrived shortly thereafter. Although reluctant to involve the police and disinclined to press charges, the Eagles did tell Hutchins and Dubois something of what had happened. From his cruiser, with the lights on and the amplifier-address system activated, Hutchins attempted to coax defendant back into the house by assuring him there would be no punishment for his earlier acts. A shot was fired, but Hutchins continued to call to defendant over the loud speaker. A second shot seriously wounded Hutchins in the arm and chest. He and Dubois then drove off to seek medical assistance.

After the departure of Hutchins and Dubois, defendant rushed into the Eagle residence yelling that he had just shot Hutchins and had to leave. Threatening Mr. and Mrs. Eagle with the gun, defendant obtained the keys to the Eagles' red Javelin automobile and drove off. The next morning, a few miles away, defendant was arrested after having eluded several roadblocks.

Defendant himself recalled practically nothing about the events transpiring at the Eagle residence after defendant had returned from the "quarter mile" drinking spot.

Based on the above facts, the jury found defendant guilty of (1) Assault and Battery (Simple) on Thomas Eagle, Jr. in connection with the episode when defendant cut Eagle with the kitchen knife; (2) Armed Assault and Battery on Elmer Hutchins as a result of the shooting outdoors; and (3) Armed Robbery of Mrs. Eagle based on the subsequent taking of the car keys and red Javelin automobile.

Defendant maintains that all three convictions must be reversed because (1) particular remarks of the presiding Justice infringed defendant's rights under the 5th–14th Amendments to the Constitution of the United States; and (2) the Justice's instruction to the jury erroneously placed upon the defendant the ultimate burden of proof concerning intoxication, *not self-induced*, as a basis for relieving defendant of criminal responsibility. By another contention, addressed only to his conviction of Armed Robbery, defendant asserts that it was reversible error for the presiding Justice to place upon defendant the ultimate burden of proving the existence and effect of his *voluntary* intoxication.[1]

We conclude that defendant is correct in his contention that there was error in the instructions on *involuntary* intoxication which requires reversal of all three convictions. We therefore reach none of the other issues raised.

*I.*

In his instructions, the presiding Justice expressly differentiated the obligations of proof raised by defendant's assertion that his conduct had resulted from intoxication, voluntary or involuntary, from the overall burden of the State to prove beyond a reasonable doubt each and every element of the crimes charges. The Justice said:

"The burden never shifts; the State has to prove each and every element beyond a reasonable doubt . . . . However, sometimes a defense is offered which is called an affirmative defense. The State does not have to prove the negative of that. The one who offers such a defense, here the defendant, has the burden of proving the truth of that allegation."

The Justice further instructed that defendant's burden would be met with proof

"by the greater weight of the testimony, by a fair preponderance of all of the evidence—the weighing of the scale, the tipping of the scale."

---

1. In thus confining his claim regarding *voluntary* intoxication defendant acknowledges that self-induced intoxication is relevant to produce exoneration from criminal responsibility only where the crime charged includes "specific intent" as an element of the crime. This limited impact of self-induced intoxication derives from

"the traditionally operative principle, reflecting demands of public policy, . . . that a person's *choice* to impair his usual behavioral functioning by the consumption of alcohol . . . generally will be denied recognition as a circumstance of palliation for criminal behavior . . . ." *State v. Rollins*, Me., 295 A.2d 914, 920 (1972) (emphasis in original)

See also: *State v. Smith*, Me., 277 A.2d 481, 492 (1971); *State v. Arsenault*, 152 Me. 121, 130–131, 124 A.2d 741 (1956).

Because robbery requires a finding that defendant intended permanently to deprive the victim of his property, it is a "specific intent" crime. *State v. Gordon*, Me., 321 A.2d 352, 355–357 (1974). Assault and battery, however, even where amplified by the addition of an element concerning a deadly weapon, is not. *State v. Bowden*, Me., 342 A.2d 281, 285–286 (1975); *People v. Hood*, 1 Cal.3d 444, 458–459, 82 Cal.Rptr. 618, 627, 462 P.2d 370, 379 (1969). See: *Newell v. State*, Me., 371 A.2d 118, 119 (1977).

Although he failed to make appropriate objection to the above-described instruction as given, defendant had submitted to the presiding Justice a written request for instruction *solely* in regard to *involuntary* intoxication. The substance of the requested instruction was that the State must prove beyond a reasonable doubt the absence of involuntary intoxication as causatively related to defendant's allegedly criminal behavior. Defendant maintains that this written request was sufficient to save the involuntary intoxication issue for appellate cognizance in ordinary course. *State v. Millett*, Me., 273 A.2d 504, 505–506 (1971).

■ We agree with defendant's position and reject the State's contention that to save the issue defendant should also have objected after the close of the charge in order to comply with Rule 30(b) M.R. Crim.P.

The cases cited by the State in support of its claim—*State v. Thibodeau*, Me., 353 A.2d 595 (1976); *State v. Dyer*, Me., 371 A.2d 1079 (1977); and *State v. Thompson*, Me., 370 A.2d 650 (1977)—are distinguishable.

The type of error complained of in *Thibodeau* and *Dyer* sharply differentiates them from *Millett* and the case at bar. In *Thibodeau* defendant endeavored to assure that the presiding Justice had the same conceptions as did defendant concerning the law governing the constructive presence of a principal. The presiding Justice thereupon purported to instruct in accordance with defendant's wishes. Defendant never indicated—until appeal—that the presiding Justice had not done so. Similarly, in *Dyer* the trial Justice conducted an examination of prospective jurors using questions he believed satisfactory to defendant. Here, and in *Millett*, however, the Justice knew that what he told the jurors was diametrically opposed to the formulation urged by de-

fendant in his written request and thus had opportunity to correct the error. It would have been futile for defendant here, as in *Millett*, to have renewed his obvious disagreement after completion of the charge.

*State v. Thompson*, supra, does not require a result contrary to that in *Millett*. Although in *Thompson* we adverted in general to the desirability of renewing objections following the charge in a context where, as here, the differences between the charge given and the charge requested were crystal clear,[2] in *Thompson* defendant had actually attempted a renewal of objection. (370 A.2d at 653) Hence, not only did *Thompson* decide nothing as to cases in which, as here, no such renewal of objection was undertaken but also because of the particular characteristics of the renewal of objection in *Thompson*, we there reinforced the teaching of *Millett* that issues are ripe for review where the purpose of Rule 30(b) has been met. In *Thompson* the renewal failed to specify the portion of the charge to which objection was being made. Yet, citing *State v. Boisvert*, Me., 236 A.2d 419 (1967), we decided:

> "The presiding Justice was fully aware of the defendant's requested instruction . . . . The defendant has complied with the underlying spirit of Rule 30(b) and has preserved his point for appellate review." (370 A.2d at 653)

Our decision here that defendant had adequately saved the issue of alleged error in the charge concerning the burden of proof as to involuntary intoxication is fully consistent with the rationale of our past cases.[3]

## II.

We turn to the question whether under the law of Maine governing this case defendant would be exonerated from criminal responsibility if his conduct, otherwise crim-

---

2. The trial Justice had unequivocally refused to instruct that defendant should be excused from criminal responsibility if the jury found he had acted in defense of a third person.

3. We take this occasion, nevertheless, to observe that the safer practice, no matter what the substance of the objection and how well-

known to the Justice presiding, would be to renew objections to instructions after the conclusion of the charge. See *State v. Hazelton*, Me., 330 A.2d 919, 922 n. 4 (1975). In this way the record will be beyond time-consuming attack for purposes of our review.

inal, resulted from intoxication not self-induced.

■ We answer in the affirmative, thus confirming as correct the legal principle upon which the State, the defendant and the presiding Justice all agreed at trial (even though no prior decision of this Court had definitively settled the point). We hold that there is no criminal responsibility for any acts, otherwise criminal, occurring before May 1, 1976 (the effective date of the "Maine Criminal Code", 17–A M.R.S.A.), if they are caused by defendant's intoxication which is not self-induced.[4]

Our recognition of this public policy accords with the view of a majority of other courts confronted with an appropriate case. *Commonwealth v. McAlister*, 365 Mass. 454, 313 N.E.2d 113, *cert. den.* 419 U.S. 1115, 95 S.Ct. 794, 42 L.Ed.2d 814 (1974); *City of Minneapolis v. Altimus*, Minn., 238 N.W.2d 851, 855 (1976); see also: 21 Am.Jur.2d, Criminal Law § 108, and relevant cases cited therein.

Moreover, this Court and the Maine Legislature have traditionally excused from criminal responsibility those previously held criminally responsible for reasons beyond their control. *State v. Lawrence*, 57 Me. 574 (1870); 15 M.R.S.A. § 103; 17–A M.R.S.A. § 58 (acquittal by reason of mental disease or defect).

### III.

We are thus brought to the question whether the presiding Justice erred in instructing the jury that defendant bore the ultimate burden of proof to exonerate himself of criminal responsibility on the ground that his conduct was caused by intoxication not self-induced.

Defendant claims error on federal constitutional due process grounds, relying on the authority of *Mullaney v. Wilbur*, 421 U.S.

684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). See also: *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Evans v. State*, 28 Md.App. 640, 349 A.2d 300 (1975); affirmed 278 Md. 197, 362 A.2d 629 (1976). In defendant's view the State can demonstrate

"no unique hardship on the prosecution that would justify requiring the defendant to carry the burden of proving a fact so critical to criminal culpability." (*Mullaney v. Wilbur*, supra, p. 702 of 421 U.S., p. 189, of 95 S.Ct.)

We find it unnecessary to consider this constitutional predicate of defendant's argument.

In *State v. Matheson*, Me., 363 A.2d 716 (1976), without deciding that under *Mullaney v. Wilbur*, supra, the conclusion was constitutionally compelled,[5] we held that the policy concerns and values to which the Supreme Court of the United States had adverted in *Mullaney v. Wilbur*, supra, are in accord with the public policy of Maine. We therefore decided that under the law of Maine, regardless of whether or not the federal Constitution might so require, the State must bear the ultimate burden to prove beyond a reasonable doubt the absence of entrapment. See also: *State v. McCrillis*, Me., 376 A.2d 95 (1977).

■ We now adhere to the policy choice thus effectuated in *State v. Matheson* and *State v. McCrillis* and likewise declare that when the impact of involuntary intoxication is involved in a criminal prosecution, to avoid exoneration of the defendant the State must prove beyond a reasonable doubt the absence of involuntary intoxication or of a causative relation between it and defendant's conduct.

We add that in thus adhering to the trend of our prior decisions, we also follow the most recent policy choice of the people

---

4. Thus, in contrast to voluntary intoxication, involuntary intoxication will exonerate as to all crimes and not merely those which involve specific intent as an essential element. See n. 1, supra.

5. Since our decision in *Matheson*, the United States Supreme Court has provided additional guidelines for such determinations. See, e. g., *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Hankerson v. North Carolina*, 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977).

of Maine made through their elected representatives in the Legislature. By placing the ultimate burden of proof on the State as to the involuntary intoxication issue in a case arising before the effective date of the Maine Criminal Code, we apply in such cases the same rule as the Criminal Code prescribes for cases arising after its effective date. See: 17–A M.R.S.A. § 58–A, and also § 5.

We take occasion to refute one argument of the State and thus clarify the dimensions of the public policy here discussed.

The State contends that for the purposes of allocation of the ultimate burden of proof, involuntary intoxication should be treated the same as mental disease or defect as a ground for adjudicating lack of criminal responsibility. See e. g., 15 M.R.S.A. § 102, 17–A M.R.S.A. § 58; *State v. Park*, 159 Me. 328, 337–338, 193 A.2d 1 (1963) (defendant must show mental disease or defect by a preponderance of the evidence).

We believe otherwise.

While the impact upon human behavior of involuntary intoxication may resemble that of mental disease or defect in the respect that in each a condition beyond one's control is the basis for relieving from responsibility, there is a crucial difference between them in terms of the consequences of exoneration. A defendant who is found not guilty by reason of mental disease or defect must, despite the "not guilty" adjudication, be committed to an appropriate institution within the Department of Mental Health and Corrections, and he cannot be released therefrom unless and until he proves his discharge "will not endanger the peace and safety of the public." 15 M.R.S.A. §§ 103, 104. By contrast, the defendant who is acquitted by reason of his involuntary intoxication is subject to no such deprivation of liberty but is immediately free to go at large.

Since a defendant found not guilty by reason of mental disease or defect does not immediately return to society, there is a sound practical reason underlying this Court's traditional policy choice, continued by legislative adoption of 17–A M.R.S.A. § 58–3, to place upon defendant the ultimate burden of proof as to the causative impact of mental disease or defect. We thereby elicit from the fact-finder a clear determination that defendant has in fact suffered a disease or defect which has caused the behavior (otherwise criminal). In this manner we assure ourselves of an affirmative finding upon which to rest the consequence that, notwithstanding the adjudication that defendant is "not guilty", the defendant continues thereafter to remain under governmental custodial control for at least some period of time. Were the burden to be otherwise allocated, we would lack such affirmative finding and know only that the fact-finder entertained a reasonable doubt as to the existence, or impact, of mental disease or defect.

This rationale, however, is plainly irrelevant to involuntary intoxication as a ground on which a defendant is relieved of criminal responsibility; a defendant thus exonerated is immediately released to go at large.

### IV.

The State maintains that even if the charge of the presiding Justice as to the ultimate burden of proof concerning involuntary intoxication was error, it was not reversible error. The contention is that the error must be deemed harmless because the issue of involuntary intoxication had not been sufficiently generated by the evidence and therefore should not in any event have been submitted to the jury.[6]

■  We disagree, concluding that there was evidence adequate to generate the involuntary intoxication issue for jury consideration.

---

**6.** At trial the State failed to raise the question of adequate generation and asserts it for the first time in the appeal. Since we ultimately decide that defendant in fact met his burden of production on the issue of involuntary intoxication, we do not reach the question of the effect in this particular case of the State's acquiescent attitude at the trial level.

■ Both the State and defendant correctly perceive involuntary intoxication as a question beyond the four corners of the indictment and thus not in the case unless brought within it by the production of relevant evidence. *State v. Millett*, supra; *State v. Smith*, Me., 277 A.2d 481, 492 (1971). Cf. *State v. Lebreton*, Me., 364 A.2d 645 (1976); *State v. Smith*, Me., 366 A.2d 865 (1976). They further correctly conclude that one who wishes the benefit of exoneration by virtue of the existence and causative impact of involuntary intoxication must ensure that there is adequate "generating" evidence (regardless of its source). *State v. Millett*, supra, at pp. 507–508. See also: *Patterson v. New York*, 432 U.S. 197, 231 n. 17, 97 S.Ct. 2319, 53 L.Ed.2d 281 (Powell, J., dissenting) (1977). Thus, here, defendant bore the burden to ensure the presence of evidence adequate to generate the issue of involuntary intoxication, and defendant must suffer the consequence that if he failed to discharge such burden, he was not entitled to jury consideration of the issue.

■ In recent years this Court has frequently addressed the question of "generation." Several times we have held evidence insufficient to "generate" an issue. *State v. Millett*, supra, at p. 510, and *State v. Boutot*, Me., 325 A.2d 34, 43–44 (1974) (self-defense); *State v. Smith*, Me., 277 A.2d 481, 492 (1971), and *State v. Rollins*, Me., 295 A.2d 914, 917 (1972) (voluntary intoxication); *State v. Thompson*, supra, at p. 654 (defense of third person). In other cases involving entrapment we have found the evidence sufficient to generate entrapment as a jury issue. *State v. Sherburne*, Me., 366 A.2d 1127, 1129 n. 3 (1976); *State v. Matheson*, Me., 363 A.2d 716, 722 n. 7 (1976); *State v. McCrillis*, Me., 376 A.2d 95 (1977).[7]

We find the evidence before us more substantial than that found deficient in previous cases and adequate to generate for jury

consideration whether defendant should be exonerated on grounds of the existence and causative impact of involuntary intoxication.

Defendant's claim arises out of an incident during the hour or so spent at the "quarter mile" drinking spot after the reception. As related above, defendant admitted at trial that he both smoked marijuana and drank beer during that time. The beer was supplied by David Hanscomb and Edwin Elton from Hanscomb's car.

Defendant and his wife remembered that Hanscomb and Elton had made much of one particular beer, urging defendant to drink it down quickly. Mrs. Rice's memory of that incident was especially vivid:

"They [Hanscomb and Elton] went, they got up to go into . . . [Hanscomb's] car. They went into David Hanscomb's car and they came back, . . . you know, to me it looked sneaky. Hanscomb hands . . . [defendant] an open beer and has a smirk on his face. I'll never forget it. . . . [H]e kept daring him to guzzle it. . . . He [defendant] did it. He drank the whole thing right down. A few minutes later we left."

The testimony of Edwin Elton also shed some light, even if less than the defense had hoped, on why Elton and Hanscomb wanted defendant to guzzle that beer. Produced by defendant, Elton was a reluctant witness, unable to remember much about drinking with defendant that evening except that he and Hanscomb had indeed bought beer for defendant and "probably" gave him a can at one point. Elton denied telling Brenda Rice that evening, or any other time, that the beer given defendant had been "tabbed" (had LSD in it). In view of the grudging manner in which Elton was testifying defendant sought and received a declaration from the trial Justice that Elton was hostile. By means of leading questions defendant then elicited from Elton a re-

---

7. Whether an issue is sufficiently generated is to be decided by the presiding Justice. The standard for his determination is whether the evidence is sufficient to justify the existence of a reasonable doubt as to the issue in the minds of rational jurors. If so, the issue is "generated", viz., defendant is entitled to have the issue submitted for jury consideration in his behalf.

sponse that a few days before trial Elton had made the following statement to "an attorney":

"A. I said at the party at North Berwick that I saw . . . [defendant], there was a beer that was tabbed with acid.

"Q. What does that mean?

"A. A beer that had LSD in it."

■ In addition to the memories of defendant and his wife as to the incident at the "quarter mile", and the ambiguous testimony of Edwin Elton,[8] there was other evidence tending to resolve the ambiguities of the Elton statement and creating a totality of evidence from which a rational jury could have entertained a reasonable doubt as to whether the unique intoxicated state in which defendant acted during the crimes committed on the evening of August 12, 1975 had been basically induced by defendant's own conduct or had really been the product of what other persons had done to defendant without his knowledge.

First, there was ample evidence that defendant had never before acted in such a way when drunk. Defendant's wife testified that defendant told her he was suffering "hot flashes" right before they left the "quarter mile" area. She further related that later, when they had returned to the Eagle residence,

"I was looking at . . . [defendant] straight in the face and his pupils was dilated, and he threw me on the floor and he didn't even know me. . . . He was shaking and jumping, and, you know, with his hands like jumping back like, like he was afraid something was going to happen."

Thomas Eagle, entering the room at about this time, found defendant "confused." Defendant himself asserted he remembered little of the evening's events after returning from the "quarter mile." Finally, his acts themselves—attacking friends with reckless abandon[9]—were consistent with defendant's claim that he was under the influence of an hallucinogenic drug administered to him, without his knowledge, by others.

Second, defendant produced an expert witness who, if believed, established that LSD could have been introduced into a beer without detection by the person who drank it. Defendant's expert witness further explained that dilated pupils would be a symptom of the influence of an hallucinogen, that a violent "trip" was more likely when the taker of the drug was unwittingly given it, and that a lay person observing such a person would characterize him as "crazy." Asked whether the actions of defendant as he had previously heard them related in the trial were consistent with ingestion of LSD, the witness answered in the affirmative. Moreover, the witness considered those acts more consistent with the ingestion of an hallucinogen than with consumption of alcohol, marijuana or both.

**8.** The State does not object before this Court to the admission of Elton's statement. We therefore now intimate no opinion as to whether—under the Maine common law of evidence in effect at the time of defendant's trial or under the Maine Rules of Evidence pertinent to any retrial of this case—the statement was indeed admissible. See, e. g., *Hartford Fire Insurance Company v. Stevens*, 123 Me. 368, 123 A. 38 (1924); Rule 607 and Advisers' Note, M.R. Evid.; Rule 611 M.R.Evid.

We do note that the Justice presiding had before him some indication that Elton had indeed made a statement of similar content to others, thus enhancing its reliability. That indication came from defendant's wife Brenda, who would have testified that Elton told her as they were leaving the "quarter mile" drinking spot, ". . . [Defendant's] just been tabbed." While the Justice twice ruled this evidence was not to be considered by the jury, he was himself free to consider it in connection with his own duties concerning whether other evidence—such as Elton's testimony—was admissible. *State v. Cugliata*, Me., 372 A.2d 1019, 1028 n. 6 (1977), cert. den. —— U.S. ——, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977). Again, we intimate no opinion as to the correctness of the Justice's exclusion of Mrs. Rice's testimony either when first presented and stricken, or later offered and rejected. See, e. g., *State v. Fournier*, Me., 267 A.2d 638 (1970); *State v. Gervais*, Me., 317 A.2d 796, 802–803 (1974); Rules 607, 801, 802, 804(a) and 804(b)(3), M.R. Evid.

**9.** There were several indications that Elmer Hutchins and defendant had been friends prior to August 12, 1975.

■ We conclude that the issue of whether defendant was to be exonerated of all the charges against him because his conduct had resulted from intoxication not self-induced was sufficiently generated by the evidence. Cf. *Commonwealth v. McAlister*, 365 Mass. 454, 313 N.E.2d 113, cert. den. 419 U.S. 1115, 95 S.Ct. 794, 42 L.Ed.2d 814 (1974). Thus, the instruction of the presiding Justice placing on the defendant the ultimate burden of proof as to this issue was not harmless since it bore on an issue which was subject to jury evaluation. All three judgments of conviction must, therefore, be reversed.

The entry is:

*Appeals sustained as to all three judgments of conviction entered against defendant; the judgments of conviction are set aside; remanded to the Superior Court for further proceedings consistent with the opinion herein.*

DUFRESNE, Active Retired Justice, sat at oral argument as Chief Justice, but retired prior to the preparation of the opinion. He has joined the opinion as Active Retired Justice.

All Justices concurring.